Kise v. Heath.

---

CATHARINE KISE, appellant,

*v.*

EDWARD M. HEATH et al., respondents.

The evidence in this case—*Held*, to show testamentary capacity on the part of a testatrix eighty-one years old, and that no undue influence had been exerted over her by her daughter, with whom she and her husband had lived for more than twenty-two years, although such daughter received, by the will, a larger share of the estate than her sisters, and notwithstanding such daughter and her husband had received compensation for taking care of testatrix's husband, who died before testatrix, from his estate.

Appeal from decree of Hunterdon orphans court.

*Mr. R. S. Kuhl,* for appellant.

*Mr. O. P. Chamberlin* and *Mr. H. G. Chamberlin,* for respondents.

THE ORDINARY.

This appeal brings up for review the decree of the orphans court of Hunterdon county, admitting to probate a paper pur-

porting to be the will of Rebecca Heath, deceased, late of that county. The grounds of objection to the will are twofold—incapacity and undue influence. It was executed March 5th, 1878. The testatrix was then about eighty-one years old, and was living with her daughter Miranda, wife of Francis Rittenhouse, with whom she and her husband, Daniel Heath (who died there in February, 1878), had lived for twenty-two years. She had but two other children—the caveatrix, Catharine, wife of James Kise, and Mary, wife of Reading Housel. Mrs. Rittenhouse and Mrs. Housel each had one child, and Mrs. Kise was childless. The testatrix's husband died intestate, and his property was divided, according to law, between his widow and his three children, the before-mentioned daughters of the testatrix. Shortly after his death, Mr. and Mrs. Rittenhouse removed to North Carolina. After their vendue of their property, the testatrix went, for a few days, to the house of Henry F. Bodine. From there she went to the house of her son-in-law, Reading Housel, and remained there until the fall of 1878, when she went to board at the house of her grandson, Samuel Housel, where she lived until her death, which occurred in September, 1879. On or about April 1st, 1878, the testatrix executed a letter of attorney to Henry F. Bodine, authorizing and empowering him to act for her in matters of business, and on or about the 4th of the same month, she executed a deed of trust of her property, in favor of herself, to Edward M. Heath. She had an estate of about $4,000. By the will, after directing that her debts and funeral expenses be paid, she proceeds as follows:

"In consideration of inadequate compensation for board, lodging, washing and making extra trouble incident to the infirmities of age, for the last five years, for myself and late husband, Daniel Heath, it is my will, and I do order, give and bequeath to my beloved daughter, Miranda Rittenhouse, wife of Francis Rittenhouse, $1,000, first and before any division takes place, and then she, said Miranda Rittenhouse, to share equal with my beloved daughter, Mary Housel, wife of Reading Housel, and my beloved daughter, Catharine Kise, wife of James Kise, except said Catharine Kise to have only the use or interest of her share during her natural life, and at her death her share to be divided equal between my two daughters, Mary Housel and Miranda Rittenhouse, if they be living, or to their legal representatives, if they, or either of them, be dead."

Kise v. Heath.

At the time of making the will, a claim made by Mrs. Ritten-house and her husband against the estate of Daniel Heath, for extra compensation for the care of him and his wife, the testa-trix, was under negotiation for settlement between them and the representatives of the estate, and it was compromised by the pay-ment by the administrators of $1,200, as such compensation. There was an agreement between Daniel Heath and the Ritten-houses for the payment of $200 a year for the board of himself and his wife, and the $1,200 were allowed as extra compensation for the twenty-two years during which Heath and his wife had lived with the Rittenhouses. The $1,200 appear to have been paid April 4th, 1878, about a month after the making of the will in question. When the settlement and payment were made, the Housels and Kises were ignorant of the provision made in the will for Mrs. Rittenhouse, as compensation for the same services. The will was executed with due legal formalities. The testimony on the subject establishes the fact that at the time when the will was made, the testatrix fully understood the business in which she was engaged, and was possessed of testamentary capacity. She herself gave the instructions for the will, and after it had been prepared, it was twice read over to her, and she approved of it. She herself named the executors. Of the wit-nesses to the will, one, David Bodine, was intimately acquainted with her, and in answer to the question whether she was of sound mind when she executed it, he says, in substance, that he saw nothing to induce him to think that she was not. The other, John H. Philkill, was asked whether she was childish or not, and declined to give an opinion on that subject. He was not asked whether, in his opinion, she had sufficient capacity to enable her to make a will. Two physicians were sworn on the subject of capacity—one, Dr. Cramer, on behalf of the caveatrix, and the other, Dr. Reiley, on behalf of the proponents. The former testifies that he attended the testatrix professionally for several years before her death. He says that he was at Ritten-house's frequently during the last two years that the testatrix lived there, and that he thinks that what she said during those years was intelligent. He also says that from what he saw and

16

knew of her during the years that he attended her, her physical
and mental condition was not such as necessarily to require some
one to take care of her.   Dr. Reiley became acquainted with her
seven or eight months before her death.   He says he talked
with her on several topics, and she talked very sensibly; and he
says that during the time he knew her he is clearly of opinion
that she was competent to make a will.

This latter testimony is important, because it is claimed by the
caveatrix that the alleged incapacity was the result of the failure
of the testatrix's physical and mental powers by reason of old
age.   The testimony of Dr. Cramer, before referred to, bears
directly on the allegation made by the caveatrix, that the testa-
trix was incompetent, by reason of her physical and mental im-
becility, to take any care of herself.   The proof is, that though
she had the physical infirmities usually concomitant upon ad-
vanced age, she retained her mental capacity.   Her memory was
good.   This was strikingly manifested in the preparations for
her husband's funeral.   She supplied the names of persons to be
invited whom her daughter, Mrs. Rittenhouse, had overlooked.
She was able to count money and to make change.   She frequently
read the Bible, and was a faithful attendant at the church of
which she was a member, and she appears, from the evidence, to
have been an attentive, appreciative and critical listener to the
preaching.   She was of a taciturn disposition, but when she spoke,
she spoke with intelligence.   I attach no importance to the tes-
timony on the part of the caveatrix in regard to the testatrix's
conduct at the funeral of her husband, which, it is urged, is
evidence of imbecility.   In the first place, it is met and over-
thrown by counter-testimony on the part of the proponents, and
in the next place, the fact that she gave no manifestation of grief
on the occasion, would not, if such had been the fact, be evidence
of incapacity.   I see no reason to doubt that she was pos-
sessed of full testamentary capacity.   In this connection, it may
be remarked that the letter of attorney and deed of trust were
executed by her, with the knowledge of her family, within a
month of the time when the will was made, and her capacity to

execute those instruments seems never to have been doubted or questioned.

It is urged, however, that there is evidence that Mrs. Rittenhouse, the principal legatee, exercised undue influence over her. The grounds on which this claim is based, are that the situation of the parties afforded opportunity for such influence, and that Mrs. Rittenhouse, on the occasion when the instructions for the will were given, made use of an expression which indicated the exercise of it. Mr. Chamberlin was the draughtsman of the will. He appears to have been sent to do the work by his father, who was a scrivener, and who had been requested to draw the will, but from infirmity was disinclined to do it. He says his father communicated to him the fact that the testatrix wanted to see him, or wanted to make a will. He states that he went to see her accordingly; that he said to her that he understood that she wanted to make her will, and she answered that she did; that he then asked her how she wanted it, and she replied that she hardly knew how; that he then said that she must know—that he could not; that she made no immediate answer to that remark; that he then said that she had three daughters, and asked if she wanted to leave them equal shares of her property, and she replied, "Why, yes—I guess so;" that just then Mrs. Rittenhouse came in and said to her: "There is no use in your making a will;" and after making that remark, went out of the room, and then the testatrix proceeded, and told him what disposition she desired to make of her property, which he says was just what the will, as executed, provided for. He adds that he asked her whom she wanted for executor, and she said she had not thought about that. She subsequently, when the draft of the will was approved by her, named the executors, as before stated. The caveatrix insists that the above-mentioned remark of Mrs. Rittenhouse is evidence of undue influence. It does not appear, however, that the latter had any part in the making of the will. She was not present when the instructions for it were given, though they were given at her house. She was not present when the draft of the will was read over by the draughtsman to the testatrix. He says no one was present except himself and the testatrix.

She was not present when the will was executed. Mr. Chamberlin gives the following account of the testatrix's instructions for the will : She said that she and her husband had, on account of their sickness, been a great deal of trouble to Miranda; that Miranda had to have extra help about the house, and to have strangers there to watch with her, the testatrix's, husband in his sickness, and she wanted her paid for it; that she wanted her to have the first $1,000 before any division took place, and then to share equally with the others, and that Katy (Mrs. Kise, the caveatrix) was to have only the use of her share. He says that he said to her that he supposed she meant the interest, and she said " yes." He says he thinks she said she did not want Mrs. Kise's husband to have it when Mrs. Kise was done with it, but wanted Mary (Mrs. Housel) and Miranda (Mrs. Rittenhouse) to have it. The will having been executed with due formalities, and the testatrix having been, at the time of executing it, of competent understanding, the burden of proof of undue influence is on the caveatrix. And undue influence must be proved. As was said in *Humphrey's Will, 11 C. E. Gr. 513*, it is not a presumption, but a conclusion. See also *Boyse* v. *Rossborough, 6 H. of L. Cas. 2*. There does not appear to have been any undue influence when the draft of the will was read and approved, or when the will was executed. Giving to the remark made by Mrs. Rittenhouse its fullest effect, it was a suggestion pertinent to the reply of the testatrix to the question of the scrivener whether she wanted to leave her property to her three daughters in equal shares, or how she would leave it, she answered " Yes; I guess so." But, as before stated, it appears that she had previously, in the same conversation, told the scrivener that she hardly knew how she wanted to leave her property, and her reply was merely indicative of her concurrence in his suggestion, so far as her general intention was concerned, that her daughters were to have her property; but it did not indicate her full intention on the subject. She subsequently gave him her reason for the gift of $1,000 to Mrs. Rittenhouse. It was a recognition of, and compensation for, faithful services and kind attention rendered to her and her husband for over twenty years in their old

age. It is quite probable that she intended to give to the daughter who had thus discharged her filial duty towards her parents, a substantial reward out of her own estate, irrespective of what her daughter's husband might obtain for the same services out of the estate of her father, the testatrix's husband. Nor is it at all surprising that the testatrix, in the distribution of her property, made a marked discrimination in favor of the daughter with whom she and her husband had passed more than a score of years of their old age, and under whose roof they had found a comfortable home, and to whose filial piety they had been so much indebted.

The scrivener says that he saw nothing to indicate incapacity during the interview in which the remark of Mrs. Rittenhouse was made, and that he is of opinion that the remark did not influence the testatrix in the disposition of her property.

The testatrix lived for about eighteen months after the $1,200 were paid, and it appears that she had testamentary capacity up to the time of her death; yet she never intimated any dissatisfaction with the will she had made, nor indicated any desire to alter it. It is proved that she was liberal in the use of her money, and that she insisted on her right to do what she pleased with it. Reading Housel, called for the caveatrix, says that one night while she was at his house, (she appears to have been there from April to October, 1878), his wife (her daughter Mary), referring to the gift by the testatrix of the sum of twenty-five cents to the witness's daughter, said to the testatrix that she ought not to be giving her money away, and he says the testatrix seemed to be affronted, and said that her money was her own, and she had a right to do what she pleased with it. There is no evidence, whatever, that the testatrix was not, in making the will, a perfectly free agent; none that her judgment, discretion or wish was overborne by Mrs. Rittenhouse, or that she was acting under any restraint. In other words, there is no evidence that the will was not her own. On the other hand, it appears that she acted of her own volition, and without restraint. The decree of the orphans' court will be affirmed; the costs of appeal to be paid by the appellants.