OF

THE STATE OF NEW JERSEY.

### FEBRUARY TERM, 1890.

ALEXANDER T. McGILL, ORDINARY.

ABRAHAM V. VAN FLEET, VICE-ORDINARY.

VIRGINIA A. FRITZ, appellant,

*v.*

THOMAS B. TURNER, respondent.

1. The statutory requirement that a testator shall sign his will is complied with, though the testator's hand be guided in writing his signature or making his mark or *signum* on the paper, if his purpose to sign, and best physical effort to do so, participate in the act.

2. Inference that a will is the product of undue influence will not be drawn from circumstances which are shown to have occurred naturally and harmlessly.

On appeal from a decree of the Gloucester orphans court.

[515]

*Mr. D. J. Pancoast,* for the appellant.

*Mr. M. P. Grey,* for the respondent.

THE ORDINARY.

Upon this appeal the daughter of Isaac H. Turner questions the decree of the Gloucester county orphans court, which admits a disputed paper to probate as her father's last will. By this paper Mr. Turner's entire estate is given to his son, the respondent, in fee, subject to the payment of one-third of the annual income of his farm to his widow during her life. The provision for the widow is in lieu of her dower. All other wills are revoked, and the respondent is made sole executor.

The paper is attacked upon two grounds—*First,* because it was not signed by the testator, as the statute requires; and, *second,* because it is claimed that it was the product of undue influence, exercised by the respondent.

In the *Matter of Gertrude Rice McElwaine, 3 C. E. Gr. 499,* Chancellor Zabriskie, sitting as ordinary, says, that the statute of this state requires that a testator must himself sign his will; that he cannot direct or authorize another to sign it for him. This case has been acted upon since 1867 as the proper construction of our statute, and it now also meets with approval.

The evidence discloses that at the execution of the disputed paper, Isaac Turner was so weak that he was assisted to rise, and that then the draughtsman of the document held his hand and assisted him to write in distinct characters the name "Isaac H. Turner." The three witnesses to the will are unanimous in their testimony that the draughtsman "steadied" the testator's hand which held the pen. Nevertheless, it is disputed whether the hand was merely steadied or whether it was so guided as to cause it to write the name. Contradictory evidence was offered upon the question whether the testator could write at all, and expressions used by the draughtsman of the will are urged as indicative of the fact that he so guided the testator's hand as to form the letters in the name written. It is not necessary for me to attempt to reconcile the contradictory testimony upon the subject.

of the testator's ability to write, or to determine precisely how far the draughtsman of the will controlled his hand. The important question is, whether the testator had the purpose to write his name or make his mark upon the will as his signature to it, and whether, in fact, he did make such a physical effort to sign as resulted in a mark upon the paper by which the paper could be identified. The legislature could not have intended that the testator's *signum* must be his unaided act. It is but reasonable to hold, that the extent of the legislative purpose was to require such physical action upon the part of the testator as would not only awaken him to, and impress him with, the importance of the transaction in which he was engaged, but also result in some mark upon the will by which it might be known.

In the case referred to, Chancellor Zabriskie said : " The signing required by this statute must be held to be some signature, making some mark or *signum* upon paper so as to identify and give efficacy to it by some act and not by words merely." Such an act I think can be performed, even though the testator's hand be " *steadied* " or " *guided*," if his purpose to sign and best physical effort participate in it. It would be unreasonable and productive of hardship, to reject a will as improperly executed, merely because a feeble, trembling testator asks for assistance or even guidance in affixing to his will the *signum* which the law requires.

The second question is, whether the will was the product of undue influence.

That influence which will vitiate a will must be such as so far to destroy the free agency of the testator as to constrain him to do that which is against his will, or that which he would not have done if he had been left to himself. It must be some species of moral or physical coercion, which, under the conditions in which he was placed, he was unable to resist—no matter from what source it comes or what character it appears in, whether it be in the shape of physical force, threats, importunity, or other species of domination. *Den, Trumbull* v. *Gibbons, 2 Zab. 117, 136 ; Moore* v. *Blauvelt, 2 McCart. 367 ; Lynch* v. *Clements, 9 C. E. Gr. 431 ; Haydock* v. *Haydock, 6 Stew. Eq. 494, 496 ; S. C. on*

*appeal, 7 Stew. Eq. 570; Waddington* v. *Buzby, 18 Stew. Eq. 173; Dumont* v. *Dumont, 1 Dick. Ch. Rep. 223.*

Such influence need not be proved directly. It may be established by inference from circumstances attending the preparation and execution of the will. The circumstances of this character which are most familiar to the courts are, that the testator was in an enfeebled condition of mind ; that he was under the dominating influence of the favored legatees ; that such legatees prepared the will and superintended its execution, and, about the time of that execution, excluded natural objects of the testator's bounty from his society and kept secret the fact of the existence of the instrument from those who would naturally be interested in it, and the like. Combinations of such *indicia* of undue influence may throw upon those who offer the will for probate the burden of showing that it was the spontaneous act of the testator. But, at the same time, they may exist under circumstances which so explain them that it at once appears that their occurrence was both natural and harmless. Each case must depend upon, and be judged by, its own surroundings.

In the case considered, the testator was an old man, seventy-six years of age. He had been a hard-working farmer all his life. He did not suffer with any disease, but at the time the will was made was so enfeebled by old age and its attendant infirmities, that he was no longer able to move about and care for himself. His wife was living, but he had been separated from her, because of their disagreement, for fourteen years. His daughter, the appellant, against his wishes, had obtained a divorce from her first husband and within a few days thereafter had married another. She had moved to Philadelphia, and, at the time the disputed will was made, had not visited her father for two years. When she had last visited him, it was while he was sick, at the urgent solicitation of her brother. She admits that her father did not visit her. The only other child and natural object of testator's bounty was the respondent, his son, with whom he lived during the last six years of his life. This son appears to have been educated as a physician. He evidently had the father's full confidence. There is not a particle of evidence in

the case to show that the father was either in fear of him or otherwise controlled by him.

By a former will the testator had given his wife one-third of his farm and to his son the residue of his estate, enjoining the son, however, that if his sister should ever come to extreme want, he should provide something for her.

The present instrument differs from that testamentary purpose in giving the wife one-third the income of the farm for her life, instead of an undivided third of the property in fee, and in omitting the injunction to the son to care for the testator's daughter. It was drawn by Asa G. Turner, a nephew of the testator, who resided at Pennsgrove in Salem county, some miles from his uncle. Some ten days before the paper was drawn, the respondent called at this nephew's house and stated that the testator had sent for him to come and draw his will. The nephew could not go at that time, but, without having made an appointment to do so, some ten days later, on the morning of November 22d, A. D. 1888, visited his uncle, taking with him paper and pen. He saw the testator alone and took from him the instructions from which the disputed paper was drawn. During the giving of the instructions the former will was read and the desired changes were indicated. When the paper was finished it was read over to the testator, and he expressed his satisfaction with it. While the will was thus being prepared, the respondent went to the farm of another cousin, a mile distant, and told that cousin's wife to send her husband and one Bolton Avis to his house to witness his father's will. Later in the day the witnesses thus summoned appeared, and the will was executed. At its execution the draughtsman, the other two witnesses, the testator and the respondent, were present. The testator was lying upon a lounge. He talked with the witnesses and, at one time, sat up a little while.

There is not the slightest intimation upon the part of any witness that he was not in entire possession of all his mental faculties. As to his physical condition, one witness says that he was "a good bit unwell and miserable," and another, that he "had been ailing maybe a month or so," and all agree that he had to

be aided in rising and signing the will. He appears to have intelligently declared the paper to be his will, and to have fully understood the formalities attending its execution.

It also appears that no other physician than his son attended him, and that the respondent did not notify the appellant of her father's last illness.

The widow appears to have known of the sickness a month before, but whether she went to her husband does not appear.

From this state of facts is gathered the circumstances which the appellant relies upon as indicative of the son's undue influence—they are, his summoning the scrivener who prepared the will, and also the witnesses to it; his presence at the time of its execution; his failure to call in another physician; the absence of the wife and daughter and the failure to send for them. These circumstances appear to me to be so naturally and satisfactorily explained by the situation and surroundings of the parties in this case, that they are devoid of suspicious significance. The testator lived with his son. He could not, himself, summon the scrivener. His wife and daughter were both away from him. What more natural than for him to call upon his son to assist him, and what more natural than for that son to render the assistance desired? The father was dying with the infirmities of old age. The son was a physician fitted to render him any medical assistance that he needed. The daughter had been undutiful to him. Her conduct had so affected him that he did not visit her, and she suffered two years to pass without visiting him. His wife had been separated from him for fourteen years. It would not have added to his comfort to send for either of these women. But it is to be remembered that the wife knew of his illness a month before he died. Her duty called her to his bedside, and that she did not come, does not appear to be the fault of the son. The relations between the mother and daughter appear to have been amicable. Why may not the mother have notified the daughter of her father's illness? The son's presence at the execution of the will was, I think, nothing more than indiscretion. At the time when the instructions for the will were given, and the instrument in dispute was prepared, he was absent. In that

proceeding his father had been wearied. Two witnesses had been called and an additional ordeal was to still further exhaust him. The son was his physician and natural protector. Why may it not be as fair to assume that his presence was the outcome of his consideration for his father's condition, as to conclude that it was in furtherance of a scheme to unduly influence him? The will does not appear to be unnatural. Reasons evidently existed for disregarding the daughter and for confining the wife to the equivalent of that which the law would give her. It was the testator's right to weigh the claims upon his bounty and to deal with them as he thought they merited. If, possessing capacity, he freely did so, this court cannot reject his will merely because it may possibly differ with him in his conclusions.

I agree with the determination of the orphans court, and will affirm its decree.