JOHN O. WHITE, appellant,

*v.*

BENJAMIN A. STARR, JESSE W. STARR, JR., and GEORGE
F. ARCHER, respondents.

1. Upon appeal from an orphans court, in a will contest, the prerogative
court may, in its discretion, take additional evidence, to be used at the hearing.

2. In such a contest it was disclosed that at the period of time when the
will was executed, the testator's mind was, to some extent, impaired by old age
and trouble; that second childhood was asserting itself; that, at times, he
would momentarily lose control of his mental power, but usually he was in
full possession of his faculties, and that at the very time of the execution of
his will, he was in full possession of his faculties.—*Held*, that the proofs were
insufficient to show that he lacked capacity to make a will.

3. That influence which destroys the free agency of a testator in making
his will, is undue.

White v. Starr.

4. Influence acquired by kindness and affection honestly and fairly bestowed ·upon an aged person is not undue, though it may induce testamentary recom-·pense.

On appeal from the orphans court of Camden county.

*Mr. Peter L. Voorhees* and *Mr. Barker Gummere*, for the· ·appellant.

*Mr. Thomas B. Harned, Mr. D. J. Pancoast* and *Mr. Samuel H. Grey*, for the respondents.

THE ORDINARY.

The orphans court of Camden county, by its decree made on the 1st of March, 1889, refused to admit to probate a paper writing bearing date on the 24th of May, 1884, purporting to be the last will of Jesse W. Starr, deceased.

It is not disputed that the decedent executed the contested writing with all the formalities necessary to the proper making of a will. The insistment is, that at the time of such execution he did not possess testamentary capacity, and, that failing, that his mind was so weakened by age, physical infirmity and trouble, that he became the victim of a fraud perpetrated, or the subject of a dominating and undue influence exerted, by his son-in-law, the appellant, which produced the disputed will.

In their several opinions, the judges of the orphans court con-·cluded that the decedent lacked testamentary capacity, and that the execution of the will was brought about by fraudulent contrivances.

Jesse W. Starr died on the 26th day of February, A. D. 1886, when about seventy-seven years of age. In early life he became a mechanic of considerable skill. He was positive in character, self-reliant, intelligent and industrious. By close application to his business he succeeded in amassing a considerable fortune and in establishing at Camden one of the largest and most prosperous iron works in the country, costing, probably, $1,000,000. For nearly twenty years, until the close of 1868, his younger brother, John F. Starr, was his partner. Then he determined to associate

his son Benjamin, one of the respondents, and his son-in-law, Benjamin F. Archer, the father of the respondent George F. Archer, with him in business; consequently the partnership with his brother was dissolved, and he bought his brother's interest in the iron works. A new firm was then formed, consisting of himself and the son and son-in-law last named. In this partnership he supplied the entire capital.

In 1874 his son Jesse W. Starr, Jr., the remaining respondent, also without capital, was taken into the firm.

At the close of 1874 Benjamin Starr and Archer were dropped from the firm, and the son Jesse continued in the business with his father to the 1st of January, A. D. 1877. Then Benjamin Starr was again made a partner and retained in the firm until the following August and then again dropped. From August 1st, A. D. 1877, to August 10th, 1878, the decedent and his son Jesse carried on the works. At the last of those dates the business was bankrupt, and application was made to the United States district court to have it so adjudged. The liabilities ran through the last two or three firms, so that Mr. Starr and both his sons were involved in the bankruptcy proceedings. The liabilities of the firm of which Benjamin F. Archer was a member—probably more than half as much as the amount of the liabilities at the bankruptcy—had been principally paid by subsequent firms and the decedent individually, so that that firm was not included in the bankruptcy. Early in 1879 a composition with the creditors was effected, by which it was agreed that upon the payment of seventy per cent. of their several debts, which amounted in the aggregate to more than $600,000, the debts should be discharged. The seventy per cent. was to be paid in four installments—one of ten per cent., payable in one year; one of fifteen per cent., payable in two years; one of twenty per cent., payable in three years, and one of twenty-five per cent., payable in four years. By agreement, the decedent was to give his individual notes, and, to secure their payment, his mortgage upon substantially his entire estate, and also to submit the control of the iron works to a manager to be appointed and supervised by a committee of the creditors. The mortgage was to be given to the Camden Safe Deposit

White v. Starr.

and Trust Company, as trustee, and, as portions of the estate could be sold with the consent of the committee of creditors, the trust company was to release the portion sold from the mortgage, and the proceeds of sale were to be devoted to the payment of the installment notes.  The notes and mortgages were given in pursuance of this agreement, and the iron works passed into the control of the creditors.  During the times that the sons, Benjamin and Jesse, and the son-in-law, Archer, were connected with the business, they drew large sums of money from it for their private use.  Archer drew upwards of $136,000; Benjamin Starr drew more than $184,000, and Jesse, Jr., drew over $80,000, and at the same time the decedent gave his daughter Elizabeth, wife of the appellant, about $8,000.  When the works were again put in operation, John F. Starr became manager for the creditors, and so successfully conducted the business that the first payment under the composition was duly made.  Then, in March, 1881, John F. Starr retired from the management, and, at the decedent's solicitation, the creditors put the respondent Jesse W. Starr, Jr., in his place.  Under this new management, within eight months, some $75,000 were lost, and it became necessary to dismiss the manager.  After that the creditors' committee, through their agent, operated the works until January, A. D. 1883, when work was entirely suspended.

Upon the dismissal of the respondent Jesse W. Starr, Jr., from the management, in November, 1881, it became apparent, because of the new loss, that the iron works could not be saved, and that the last installments to be paid to the creditors could not be met, and that the property must be entirely lost unless some new arrangement could be made with the creditors.  If the last installment was not paid or some settlement made, the creditors would be entitled to the full payment of their claims instead of the payment of the remainder of seventy per cent. of them, and, the composition agreement being broken, the personal liability of Benjamin and Jesse, Jr., would revive.

At this juncture of affairs, the decedent, by writing signed by him, authorized his son-in-law, the appellant, to negotiate a sale of the iron works for an amount sufficient to pay a first mort-

gage thereon of $100,000, and the unpaid composition notes and manager's expenses, upon terms to be approved by the creditors' committee. And, at the same time, Jesse W. Starr, Jr., wrote to the appellant offering his assistance in such negotiations, and promising that, if a sale should be effected, he would make no claim for some $26,000 that he had advanced to assist in the payment of the second series of composition notes. In the following March (1882) the decedent executed a formal power of attorney, by which he clothed the appellant with authority to deal for him with the creditors, and to agree for a sale of his estate or any part of it, and to take the proceeds of sale and apply them to the payment of the decedent's debts. Under the authority thus given, the appellant sold some of the real estate for sufficient money to pay the whole, or a large portion, of the third series of composition notes.

During the year 1882 the decedent's homestead was sold under foreclosure of a mortgage, and it was thought that he would be turned out of it. He had resided there for many years, and was so much attached to the place that disastrous consequences of an eviction from it, to his health, were feared. Some informality in the advertisement of sale enabled the appellant to have the sale set aside. Before a resale could be managed he procured one Edward H. Cohn to purchase several parcels of the decedent's lands, including the homestead, for enough to pay the mortgage decree and give the creditors $5,000 for a release from the trust company mortgage and secure the conveyance of the homestead, subject to a mortgage of $12,000, to himself. In December of the same year Mr. Starr's wife died. After her death his daughter, the appellant's wife, went to live with him, and resided in the homestead until March, 1883, when her husband exchanged that property for a house on the corner of Fourth and Cooper streets, in Camden, which he caused to be conveyed to her. After this exchange Mr. Starr took up his residence with his daughter and the appellant, in the last-named property. The entire second floor of the house, consisting of two large rooms and a bath-room, were devoted to his use, and, so far as I can gather from the evidence, he was surrounded with every comfort, and was most affec-

White *v.* Starr.

·tionately and kindly treated by both the appellant and his wife. It does not appear that his son-in-law, Archer, or his sons, Benjamin and Jesse, offered him a home or did anything to contribute ·to his comfort. On the contrary, his check-book shows payments ·to his son Jesse, and the testimony indicates, that more than once his sons appealed to him for pecuniary assistance from his meager ·bank account.

In May, 1883, conceiving that the committee of his creditors had mismanaged the iron works and used them for their individual advantage, he commenced a suit in equity against them in the United States circuit court, for the purpose of having them account. While this suit was pending, the appellant succeeded in finding a number of gentlemen who were willing to organize a corporation and buy the iron works. After considerable negotiation it was arranged that the works should be sold for $225,000, and that the sum realized from the sale should be accepted in full satisfaction of the first mortgage upon the works and the balance of the creditors' claims. Pending this negotiation the appellant sought from Mr. Starr a revocation of the power of attorney that had been given to him in March, 1882, and, upon the 27th day of September, 1883, by an instrument in writing, signed, sealed and acknowledged by Mr. Starr, the power of attorney was revoked. That revocation contained this recital :

"And whereas, the said John O. White desires to surrender said power of attorney, and be relieved from the confidences therein reposed, to the end that he may negotiate *with me* or with my creditors concerning my property *for his individual advantage;* Now know all men" &c.

Also, pending the negotiations, notices were then sent out to the creditors for the purpose of obtaining their consent to the proposed sale. The committee of creditors did not take the responsibility of making it, for the fourth installment notes, with interest, then amounted to nearly $200,000, and the acceptance of the proposed arrangement would involve the creditors in a loss of almost one-half their claims. The notices thus sent out gave publicity to the negotiations, and, on the 17th of October, 1883, the respondent Jesse W. Starr, Jr., commenced a suit in

equity to restrain his father from selling his property and the Camden Safe Deposit and Trust Company from canceling the creditors' mortgage. The basis of his suit was his advance of $26,000 in the payment of the second series of composition notes, which he claimed gave him an equitable right to the security of the mortgage. By his bill, and in tne affidavit annexed to it, he charged that he had been credibly informed that the creditors and his father had united in an agreement to cancel the mortgage, and that his father was about to sell the mortgaged premises. Upon the filing of the bill an injunction issued according to its prayer, but, on October, 23d, A. D. 1883, it was, upon motion, modified so as to permit Mr. Starr to sell his real estate, and in the following February it was dissolved, and the bill itself was dismissed.

Upon the modification of the injunction, by deeds and bills of sale, with the consent of the creditors, Mr. Starr conveyed and transferred to the appellant, not only the iron works, but substantially all of the remainder of his estate. Afterwards, in November, 1883, the appellant transferred the iron works to the corporation that he had been instrumental in organizing, and since then he has sold or exchanged nearly all the remainder of the property that Mr. Starr conveyed to him. He admits that his profits, above his disbursements, have amounted nearly to $70,000.

After the conveyances to the appellant, the decedent executed the will now in dispute. It, in substance, recites that he has made large advances to his sons Benjamin and Jesse and has paid their indebtedness growing out of their connection with him in the iron works, and then provides that accounts between him and them shall be considered as balanced and settled, and that each son shall have $500. It also recites that the testator has "done large favors" for the father of George F. Archer, the decedent's grandson, which the testator trusts the father will have enure to the benefit of his son, and then gives $1 to the younger Archer. The residue of the estate is given to the decedent's daughter, Elizabeth, and the appellant, her husband, is made sole executor of the will.

White *v.* Starr.

The decedent's estate has been inventoried and appraised as being worth less than $4,000. The great volume of testimony that has been taken in this contest, the number and eminence of the counsel employed, and the elaborateness and earnestness with which they have presented the case, indicates that if the paper here disputed shall not be sustained as Mr. Starr's will, this litigation is but an initial step in an effort to wrest from the appellant the profit he has made from the property conveyed to him.

The proofs disclose that Mr. Starr executed in all three wills. The first of them was made in August, 1879. By it provision was first made for carrying out the composition with the testator's creditors, and then, subject to the demands of the composition agreement, his homestead and an annuity of $5,000 were secured to his wife for life, and the residue of his estate was divided equally between his three children, after deducting therefrom, for his grandson George F. Archer, a share equal to the dividend produced by dividing that residue by the whole number of the testator's grandchildren. The appellant, Mr. Peter L. Voorhees and the testator's brother, John F. Starr, were appointed its executors.

The second will was executed on the 18th of June, 1883. After revoking all other wills it proceeds with recitals concerning the decedent's advances to and payments for his sons similar to those contained in the will of 1884, now in dispute, and directs that his account with his sons be considered as balanced and settled. It also recites that he has " done large favors " for his son-in-law Archer, which he trusts may enure to the benefit of his grandson Benjamin F. Archer, and provides a legacy of $1 for that grandson. It further recites that his advances and gifts to his daughter Elizabeth have been inconsiderable and disproportionate to those which his sons have received, and directs that she shall not be accountable for them, and then bequeaths to her all his " furniture, pictures, horses, carriages and harness and the sum of twenty-five thousand dollars." And it then directs that the residue of his estate shall be equally divided between his two sons and his daughter, and, lastly, it appoints the appellant its sole executor, with power to sell real estate.

The will of 1879 was drawn by Mr. Peter L. Voorhees, a lawyer, who represented Mr. Starr's creditors. After that will was executed, Mr. Voorhees retained it until March 12th, 1884, when he delivered it to Isaac Dolson, the decedent's coachman, who brought him an order therefor written by the decedent in his own handwriting. After Mr. Starr's death the will so delivered was found among his private papers, his signature to it having been cut out. Upon the margin of the page from which the signature had been removed there was, written in ink, in Mr. Starr's handwriting, the words " Destroyed and canceled, Jesse W. Starr."

The wills of 1883 and 1884 were drawn by Christopher A. Bergen, another lawyer, who had both of them in his possession when Mr. Starr died, in 1886.

The first question to be determined in this controversy is, whether Mr. Starr possessed testamentary capacity when he executed the will of 1884. A great mass of testimony has been taken upon this issue. It discloses that as early as 1879 the decedent betrayed forgetfulness of recent events ; that in 1881 he would unnecessarily repeat statements that he had just made, and that in 1882 he exhibited an inclination to deal with trivial matters to the neglect of those of greater consequence. It is testified that, in 1882, he would, at times, become confused in giving orders ; that he became so eccentric that he called upon a druggist to have new bristles put in an old tooth-brush ; that he made apparently aimless calls upon friends, continuously looked at his watch while with them, and repeatedly shook hands with them and expressed pleasure in seeing them. It is also in evidence that, in 1883, his forgetfulness and confusion increased ; that he ceased to take interest in the affairs of the iron works ; that he would habitually buy candy and distribute it to children and offer it to grown people ; that once, while driving, he failed to recognize his son Jesse ; that once, when greeted by an old employe, he stared at him blankly, and did not recognize him ; that he confused one John D. Glover with one Glover Eastlack, because of the word Glover in each name ; that once he begged a grand-daughter to play on a piano for him, and when she did so, con-

trary to his accustomed dignity, got up and danced in the presence of guests; that when he visited at his son Benjamin's house, he would habitually repeat these words, " I love and you love me,. I've come to see you, you are glad to see me"; that he would. call at his son Benjamin's, and after going away return in a few minutes, apparently forgetful that he had just been there, and in. conversation would frequently wander from subject to subject. without completing any of the subjects touched upon.    Early in. 1884 he commenced to ride upon railway cars and in steamboats on the Delaware.    He rode so constantly upon the railroad that,. in July, 1884, the president of the West Jersey Railroad Company sent him a free pass, and thereafter it became his habit, nearly every afternoon, to ride from Camden to Newfield and back.    It is testified that he was restless while on the train; that he would. habitually change his seat; that upon one occasion he went into the smoking-car and called aloud, " No smoking, no smoking,'" three or four times; that at another time he used insulting language to a gentleman who was smoking, and then sat down in, front of him and kept mumbling to himself the most insulting of. the expressions he had used, thereby convincing the gentleman. that he was crazy, and that he frequently stood up as the train. would approach a station.    His son Jesse testifies that upon one occasion, in 1884, he walked in the street with his father and; talked with him, but was not recognized.    His former physician, states that in the same year the decedent failed to recognize him, even after the physician had told him who he was, but he adds. that upon a subsequent occasion he was recognized.    It is also in. proof that one day during the year 1884 he failed to recognize three of his old employes when they spoke to him at the iron works.    Another witness speaks of his once inquiring where he was, when he was within three blocks of his residence.    It is. further shown, that in February, 1885, he went to the barber shop, in which he was accustomed to get shaved, hung his hat on a rack, sat down and then three or four times nervously took. his hat down and looked at it, and finally got up from his chair;. stroking his chin as if he had been shaved, and handed the barber twenty-five cents.    When told that he was not yet shaved and

·must wait, he put the money in his pocket, mumbled something·
·and went out. The same barber says that the decedent had a
coat which had been made in Ireland, and that he would constantly
tell about it. Sometimes, when he wore it, he would repeat over
and over, within a very few minutes, that it was his Irish coat.
A nephew testifies that in 1885 his uncle frequently called at his
office, and while there would constantly look at his watch and
·compare it with the clock, and in conversation, after every ques-
tion would say, "I am glad I came."

It does not seem possible in the face of this testimony to doubt
·that, subsequent to Mr. Starr's bankruptcy and the death of his
wife, his mind became to some extent enfeebled. The character
.and evident sincerity of many of the witnesses forbid disbelief
of their statements, yet, on the other side, the proponent pro-
·duces equally credible witnesses, who speak of circumstances
which would seem to put the fact that the decedent usually pos-
sessed mental ability beyond doubt. Many of his failures to
·recognize acquaintances may be attributed to the fact that from
1874 or 1875 his eyesight was seriously impaired. It is conceded
·that, in 1875, he was nearly blind from cataract, the sight from
·one eye being lost, and the sight from the other greatly obscured.
In 1875 one of his eyes was operated upon with some success,
.and thereafter, by the aid of powerful glasses, his vision from
that eye was imperfectly restored. A witness, who appears to me
to be entitled to full credit, testifies that he met Mr. Starr in the
spring or summer of 1885, and was not recognized until he spoke,
·and that thereupon Mr. Starr called him by name, and explained
that he had such difficulty in seeing that he could not always
·recognize acquaintances until they were close upon him. But
while this infirmity affords an explanation to some of his failures
to recognize, it does not satisfactorily account for those where he
·conversed with the persons and was told their names.

In contradiction of the case made by the caveators, the pro-
ponent produced a formidable array of credible witnesses. A
woman who had nursed in Mr. Starr's family on several occa-
sions speaks of his recognizing her in the street and calling her
·by name, in the fall of 1885. An old employe of the iron works

·testifies concerning the decedent's recognition of him in Decem-
·ber, 1885, and several other witnesses speak of like recognition
while the decedent resided with the appellant. Samuel C. Cooper
·states that he met Mr. Starr several times at the appellant's dur-
ing the last two years of his life, and that he invariably found
that he conversed intelligently. Henry O'Brien, in the summer
·of 1885, while waiting in the appellant's office, talked with Mr.
.Starr at some length, and was surprised at his intelligence, in
face of the rumors that were circulating concerning his mental
condition. Samuel D. Sharp, an ex-sheriff of Camden county,
testifies that he lives in Gloucester county, and that in the sum-
mer of 1885 Mr. Starr made him a visit, from eleven in the
morning to three in the afternoon, taking dinner with him, and
in that time acted and talked intelligently. He had heard rumors
·concerning Mr. Starr's mental condition, and, consequently,
closely observed him. William Mitchell McAllister, the opti-
·cian from whom Mr. Starr was accustomed to obtain his glasses,
speaks of an interview with him in June, 1884, at which he
observed no signs of mental weakness. Alexander Rudolph, a
·confectioner, describes an interview at which Mr.·Starr evinced
·considerable memory and intelligence. Robert Lee states that
one day in June, 1885, while he was superintendent of Camp-
bell's stables, the appellant drove one of Mr. Starr's horses up
to the stables and tied it, and asked the witness to "keep an
·eye" on it while he, the appellant, went over to Philadelphia,
and then went away; that soon after Mr. Starr came along and
.asked where the appellant was, and upon being told, said that
·the horse was his and that he would take it, and got in the car-
riage and drove away. William K. Park, chief engineer of the
Philadelphia gas works, states that Mr. Starr was an old friend
.and frequently visited him, the last visit being six or eight
months before his death, and that the witness never noticed that
he had any mental infirmity. Thomas Stewart speaks of the
·decedent's visiting Wanamaker's store, in Philadelphia, in June,
1884, alone, and intelligently selecting a suit of clothes. Joseph
.J. Reed mentions a walk and intelligent conversation with him,
.at Vineland, in 1884 or 1885. William P. Street, one of his

creditors, says that Mr. Starr frequently visited his office during the last years of his life, and always appeared to him to possess capacity and understanding.  Dr. Strawbridge, the oculist who operated upon his eye in 1875, states that Mr. Starr called upon him every six months, continuing his visits after he took up his residence with the appellant, and always appeared to him to be capable and intelligent.  George G. Browning mentions several very intelligent conversations that he had with Mr. Starr in 1884 and 1885, and also says that he told the appellant, in the summer of 1885, that the impression was getting abroad that Mr. Starr's mind was affected, and warned him that, as he had important transactions with Mr. Starr, he should take steps to "have the facts settled, either by a jury or the best way he could."  Mr. Browning states that the appellant laughed when this advice was given, but it appears that he subsequently called upon two experts in insanity to visit Mr. Starr.  The first of these gentlemen, Dr. S. Preston Jones, lives at Merchantville, about four miles from Camden, where he maintains a private asylum.  He is shown to have made diseases of the mind a special and continuous study for more than thirty years.  He states that he called at the appellant's house on the 8th of July, 1885, and there dined with Mr. Starr, thus having an opportunity to observe him, and to converse with him, for an hour and a half or two hours, without betraying the object of his visit.  At considerable length he narrates his conversation with Mr. Starr, adding, that to every question he put he received an intelligent answer.  The opinion he formed was, that Mr. Starr's mind was entirely sound and that his memory was good.  He thought, that like most old people, he could not stand the prolonged mental strain that he could have stood earlier in life, but he could detect nothing that would indicate that he did not have full knowledge of his affairs and his kinsfolk.  The doctor adds :

"If I had gone into Dr. White's, never heard of Mr. Starr, sat down and took dinner with him as I did, I would never have thought for one moment that there was anything mentally wrong with him.  I might have thought, from his eating as he did, that he was slightly peculiar and eccentric; nothing farther than that."

White v. Starr.

The other expert was Charles K. Mills, the lecturer on insanity in the University of Pennsylvania and a consulting physician of the insane department of the Philadelphia Hospital. He visited Mr. Starr twice, on the 12th and 16th of February, 1886, a few days before he died. When he arrived, the first day, Mr. Starr was in bed, because he did not feel well, and, to conceal the object of his visit, the doctor was introduced as a physician called in. At the second visit, four days later, Mr. Starr was sitting in the room immediately adjoining his bed-room reading a newspaper. In course of the conversation that then ensued Mr. Starr read an item from the paper. The doctor says that the impression he received from his examination of Mr. Starr was, that he was a man enfeebled somewhat physically, probably by age, whose mind acted slowly but intelligently. He saw nothing which indicated to him that Mr. Starr was not competent to make a will. In addition to these witnesses, the appellant and his wife and several of their servants have been sworn and given testimony, in which they deny that Mr. Starr ever betrayed mental weakness. My attention has also been arrested by holograph letters written by Mr. Starr—one to his daughter, from Crescent Springs, in August, 1882; one to a Mr. Glynn, on business, in September, 1882; a letter to Mr. Voorhees, for his papers, in March, 1884; a letter of thanks for the free railroad pass, in July, 1884, and a letter to his grandson, Jesse White, at Long Branch, in August, 1885, all of which bear internal evidence of, at least, limited mental capacity. His bank check-books, extending to October 10th, 1883, most methodically and accurately kept by his own hand, exhibiting all deposits and drafts and proper balances carried from page to page, afford very strong evidence of mental capacity during the period they cover. Besides, I have not failed to notice that, in 1881, he possessed sufficient force to induce his creditors' committee to make his son manager of the iron works against the protest of their chairman; that, in September, 1882, and December, 1883, the city authorities of Camden, under the special guidance of their counsel, did not hesitate to accept his deeds, and that the respondent Jesse W. Starr, Jr., who now testifies to his father's imbecility, did not

17

hesitate to sue him in equity in October, 1883, and at law in January, 1885.

It is impossible to reconcile all the evidence in the case, but that which is free from prejudice and interest may stand unimpeached, under my conviction, after a most critical examination of the entire case, that at the period of time when the disputed will was executed, the decedent's mind was, to some extent, impaired by old age and the troubles through which he was passing; second childhood was asserting itself, and, at times, he would momentarily lose complete control of his mental power, but such loss was merely occasional and transitory. Usually he was in full possession of his faculties. It cannot be said that such a man does not possess capacity to make a will. It has been reiterated in our courts that a man's memory may be imperfect and greatly impaired by age or disease; that he may not be able, at all times, to recollect the names, the persons or the families of those with whom he has been intimately acquainted; that he may at times ask idle questions and repeat those which he has before asked, which may have been answered, and yet, at the time of executing his will, may be capable of recollecting the property he is about to dispose of and the natural objects of his bounty, and of understanding the manner in which he determines to distribute his property. *Den.* v. *Van Cleve, 4 Wash. C. C. 267; Lowe* v. *Williamson, 1 Gr. Ch. 82; Andress* v. *Weller, 2 Gr. Ch. 604; Stackhouse* v. *Horton, 2 McCart. 202; Turner* v. *Cheesman, 2 McCart. 243; Boylon* v. *Meeker, 4 Dutch. 274; Eddy's Case, 5 Stew. Eq. 701; Rusling* v. *Rusling, 9 Stew. Eq. 603.*

The amount of mental capacity must be equal to the subject-matter with which it has to deal. The testator may not have sufficient strength of memory or vigor of intellect to carry on an extensive business, or even to make and digest all parts of a single contract, yet he may be competent to direct the distribution of his property by will, for this is a subject of which he may often have thought.

The infirmities of old age should not, too readily, be accepted as proof of imbecility or incapacity. It is important to bear in mind the remark of Chief-Justice Ewing in *Sloan* v. *Maxwell,*

*2 Gr. Ch. 581,* that "the power of disposing of property is an inestimable privilege of the old. It frequently commands attention and respect when other motives have ceased to influence them. How often, without it, would the hoary head be neglected, deserted and despised."

I cannot doubt the general capacity of Mr. Starr to make the will in question. But, as at times he may have lost his accustomed control of his mind and memory, it is more than ordinarily important to know his condition at the very time of executing the instrument.

The testimony of the lawyer who drew the will in dispute exhibits that Mr. Starr, by a letter of several pages written with his own hand, gave instructions for the preparation of the will, and that, in obedience to those instructions, and in accordance with them, the will was drawn, and then submitted to Mr. Starr and examined by him and discussed between him and the witness, and then left with him by the witness, who sent his two brothers to superintend its execution. And the testimony of the subscribing witnesses indicates that Mr. Starr was in possession of his understanding at the very time the will was executed. It was executed in the appellant's office. The witnesses both speak of having known Mr. Starr for several years, and say that, after they entered the office, he came in the room and took the will from his pocket, and, upon one of them suggesting that it should be read, he replied " No," that he had read it and it was what he wanted. The witnesses say that by his conduct he impressed them as being at that time of sound and disposing mind and memory.

This testimony satisfies me that at the very time of the execution of the disputed instrument the testator was in possession of his usual mental strength, and not suffering a temporary loss of it.

The second inquiry, whether the will was the product of undue influence or fraud, presents a more difficult question. In the determination of it, the *quantum* of the mental strength and will power possessed by the decedent become important factors.

"It behooves a tribunal of justice," said Chancellor Green, in *Moore* v. *Blauvelt, 2 McCart. 367,* "while maintaining, upon the

one hand, the right of the testator to that unlimited dominion which the law gives him over his own property, to resist, upon the other, with watchful jealousy, all attempts at interference with the free and untrammeled exercise of that dominion, and to see that, in the testator's hour of weakness and infirmity, the will of another is not substituted for his own."

The respondents do not pretend to point out the exact method by which the testator was unduly influenced. They argued that it may be fairly inferred from the proofs that the appellant, educated as a physician and naturally acute and intelligent, so familiarized himself with the testator's character, habits and mental conditions, that he was able to take advantage of every weakness and obtain complete control of his action. They do not claim that there was gross coercion by physical force or intimidating threats, but that the influence was probably subtle, by timely and artful suggestion, by continual engagement of the testator's mind with those facts and reasons which were apt to induce the desired will, and the exclusion of the consideration of those circumstances and reasons which would militate against it, by a crafty working upon prejudices, or fancied, or real, wrongs, so that the testator's enfeebled mind became subject to his dominating influence.

"What constitutes undue influence," said Chancellor Green, sitting as ordinary in *Moore* v. *Blauvelt,* above cited, "can never be precisely defined. It must depend, in each case, upon the means of coercion or influence possessed by one party over the other; upon the power, authority or control of the one, the age, the sex, the temper, the mental and physical condition and the dependence of the other. Whatever destroys the free agency of the testator constitutes undue influence. Whether the object be effected by physical force or mental coercion, by threats which occasion fear, or by importunity which the testator is too weak to resist, or which extorts compliance in the hope of peace, is immaterial." In *Turner* v. *Cheesman, 2 McCart. 243, 265,* Chancellor Williamson, adopting the language of the court in *Davis* v. *Calvert et al., 5 Gill. & J. 302,* says: "A testator should enjoy full liberty and freedom in the making of his will, and possess the power to withstand all contradiction and control. That degree,

therefore, of importunity or undue influence which deprives the
testator of his free agency, which is such as he is too weak to
resist, and will render the instrument not his free and uncon-
strained act, is sufficient to invalidate it, not in relation to the
person alone by whom it is so procured, but as to all others who
are intended to be benefited by the undue influence." In *Earl* v.
*Norfolk and New Brunswick Hosiery Co.*, *9 Stew. Eq. 158, 192*,
Vice-Chancellor Van Fleet said : "All that can be said by way
of formulating a definition of what the law calls undue influence,
is to say that whatever destroys free agency and constrains the
person brought in judgment to do what is against his will, and
what he would not have done if left to himself, is undue influ-
ence, whether the control be exercised by physical force, threats,
importunity or other species of mental or physical coercion. The
extent or degree of the influence is quite immaterial, for the test
is, was the influence, whether slight or powerful, sufficient to
destroy free agency and render the act brought in judgment rather
the result of the determination of the mind of another than the
expression of the mind of the actor."

It is only in exceptional cases that direct proof of undue influ-
ence can be had.   The proof of it is, generally, by presumptions
raised by circumstances, or, in case fraud is an. element of the
undue influence, by inference from circumstances, which produces
satisfactory conviction.   There are well-recognized *indicia* of
undue influence which the courts hold raise a presumption or
justify an inference against the instrument, unless the proponent
can show that the will was the testator's free act; such as the
fact that the testator was enfeebled in mind ; within the control of
the principal beneficiary, who was the draughtsman of the will
and present at its execution ; that natural objects of the testator's
bounty were excluded from his society when the will was made
by such person ; clandestinity, and the like.   *Den., Trumbull,* v.
*Gibbons, 2 Zab. 117; Alexander's Will, 12 C. E. Gr. 463; Rus-
ling* v. *Rusling, 9 Stew. Eq. 603; Dale* v. *Dale, 11 Stew. Eq. 274;
Byard* v. *Conover, 12 Stew. Eq. 244; Waddington* v. *Buzby, 16
Stew. Eq. 154.*

As to proof of fraud Sir John Nicholl observed (*2 Eccl. Rep.. 131*) : " Cases of fraud, if tolerably well considered, are, generally speaking, only to be detected and defeated by induction of particulars, many perhaps apparently trivial."

And in the case of *Harris* v. *Vanderveer's Exrs., 6 C. E. Gr.. 561*, where the court of errors and appeals held that Dr. Vanderveer was competent to make a will, but rejected the paper offered for probate on the ground of fraud. Mr. Justice Bedle,. for the court, said : " The fact of the old age of the deceased, his. feebleness, his defect in hearing, his inability to read, and the· presence about him of an important beneficiary and also the partner in law business and otherwise of the contingent residuary legatee and devisee, brought there at the immediate request of his father, together with the opportunity for fraud and the suspicious circumstances stated, all fairly and legally require that the proponent should show that Dr. Vanderveer knew the contents of the paper."

Prominent among the circumstances and inferences which are· . urged to establish fraud or undue influence in this case, are the· insistments : that prior to the residence of Mr. Starr with the appellant, his consideration for his sons and grandson Archer was such that, in 1879, he made a will by which he fully recog-' nized them as proper recipients of his bounty ; that when that will was made the appellant complained of it as unjust, saying· that the beneficiaries under it, other than his wife, had already had all they were entitled to ; that subsequent to the testator's. coming within the appellant's control for the first time, he refused to see one of his sons, and spoke abusively of his son-in-law Archer and accused him of being the cause of his financial ruin ;. that the will of 1883, which exhibits progress in the power of the influence brought to bear upon the testator, in that it gives. the appellant's wife $25,000 advantage over her brothers and cuts the grandson Archer off with a single dollar, was made ; that the appellant was constantly in attendance upon the decedent ; that he obtained full control of the decedent's business under a power· of attorney and carried on negotiations for the sale of his prop-

erty, and when those negotiations had reached a point at which · a sale of the property was about to be effected with considerable . profit, by some unexplained influence, first obtained from the decedent a revocation of the power of attorney, the avowed object of which was to enable the appellant to deal for his own profit, and then took from him conveyances of his entire estate; · that it then became his interest to place a barrier in the way of an attack upon the title thus acquired, and the will in dispute was prepared by the lawyer who had assisted the appellant to acquire that title and who had taken his compensation in land subject to it, and was witnessed by the brothers of that lawyer, one of whom was his partner; that that will was executed in the appellant's office; that the appellant anticipated and prepared for an attack upon his transaction by calling upon the services of experts in insanity, before the testator died, and by procuring a *post-mortem* examination of the decedent's brain; that speedily after securing title to the property the appellant transferred and disposed of it, conveying part of it to relatives and friends and converting part of it as rapidly as possible into cash, and then concealed the cash, instead of depositing it in a bank where it . could be traced; that at the trial before the orphans court, he, his wife and the lawyer who prepared the will, who appeared as proctor for the appellant in that court, withheld themselves from the witness-stand, and thereby substantially refused to explain : circumstances which were involved in mystery and only suscep-.. tible of explanation by them.

After the decision of the orphans court was rendered, the . appellant and his wife and the draughtsman of this will were : examined in this court as witnesses, and also some documentary ' evidence was introduced. When application was made to the court for leave to take additional evidence, it was vigorously . resisted, upon the ground that the withholding of the evidence · so offered from the orphans court was a designed suppression of . it, by which the appellant should be bound. But the applicants . represented, under oath, that the omission to put in the evidence ; was due to the mistaken belief of counsel that there was no neces-

sity for it, and that the documentary evidence was newly discovered. The application was addressed to the discretion of the court (*Personette* v. *Johnson, 13 Stew. Eq. 173; Rusling* v. *Rusling, 9 Stew. Eq. 603; Sayre* v. *Sayre, 1 C. E. Gr. 505; Read* v. *Drake, 1 Gr. Ch. 78; Chambers* v. *Sunderland, Halst. Dig. 216* §*3*), and in the exercise of that discretion was granted. The fact that it was not offered in the orphans court remains, however, in the case, and the new evidence is received justly subject to the criticism that it is produced in full view of the vulnerable points in the proponents' case which were exposed by the arguments of counsel and the opinions of the judges in the orphans court.

The circumstances urged as *indicia* of undue influence carry with them too much force to be lightly treated. They are sufficient to excite the mind of the court to a suspicious scrutiny of the entire case, and to create doubts of the most serious nature. But I think that the supplemental proofs are sufficient to dispel those doubts.

The gentleman who prepared both the will of 1883 and the paper in dispute has been a reputable member of the bar for almost a quarter of a century, and he now enjoys the confidence of the community in which he lives in such a degree that he is its representative in the national congress. Upon his solemn oath he has testified that both of these wills were drawn pursuant to directions given him by the testator by holograph letters. He says that the will of 1883, after it had been drawn according to testator's written directions, was submitted to the testator and examined by him, and that he, the witness, went over it with the testator in the witness' office, and then called in three gentlemen from the street to witness its execution. Concerning the will of 1884, he says that he thinks the testator first spoke to him and then wrote requesting him to make alterations in the will of 1883, and that in obedience to such instruction he drew the will of 1884 and personally submitted it to the testator, and went over it with him to see if he understood it and talked to him about it, and that, upon the testator's expressing his satisfaction with it, he left it with him and afterwards sent his brothers to witness its execution. He further says, that he did not converse with any other

White v. Starr.

person or persons about the contents of either of these wills before
he prepared them, and that he did not have any conversation about
either of them with the appellant or his wife prior to their execu-
tion.   Through both these transactions he was satisfied that the
testator possessed testamentary capacity and acted freely.   He
says that he has lost the letters of instruction, but he remembers
that they were in Mr. Starr's own handwriting.

Mrs. White swears that she never had any conversation with
her father upon the subject of his making a will, and that she
never requested him to make a will or to leave his property in
any particular way; that she did not know that he had made
a will until after his death, and that she never attempted to influ-
ence him to make any testamentary disposition of his estate.

The appellant testifies that he never conversed with the testator
about the will of 1879; that he knew nothing of his making
either the will of 1883 or the will of 1884, or of Mr Starr's
letters of instruction to Mr. Bergen; that he never used any
influence to procure Mr. Starr to make a will of any kind; that
he did not know of the existence of a will of 1884 until June,
1885, when he was told of it by Mr. Bergen; that before then
he did not have any conversation with Mr. Bergen upon the sub-
ject of Mr. Starr making a will.

In the face of these solemn declarations, rather than regard
them as untrue, I think it is my duty to see if there is an expla-
nation of the circumstances adverted to, which are relied upon as
indicia of undue influence, that may be free from the taint of
evil purpose and unlawful design, and consonant with the proper
acceptance of the disputed instrument as the testator's uncon-
strained act of dominion over his property.

It is testified by the chairman of the creditors' committee, who
became thoroughly acquainted with the causes which led to Mr.
Starr's bankruptcy, that his financial ruin was brought about by
his sons, who were "extravagant, reckless and unreliable" in
their business methods.   It has already been seen that Benjamin
A. Archer profited more than $136,000 by his business connec-
tion with Mr. Starr.   The evidence discloses that he was the
financial manager of the firm with which he was connected, and

that after its dissolution he attended to the liquidation of its affairs, drawing more than $100,000 from Mr. Starr for that purpose, and closed the accounts in a manner so unsatisfactory that Mr. Starr wrote in an account-book, beneath a statement of balances made by Archer, which exhibited a large sum, additional to the $136,000, due to Archer, these words: "Above pretended settlement not correct; was never agreed to by me. Jesse W. Starr."

After the closing of the affairs of that firm Mr. Starr appeared to ignore Archer, evidently feeling that he had been wronged by him, until 1878, when the bankruptcy had become imminent, and he engaged his services, principally as accountant, for two or three months, and then, for some unexplained reason, summarily dismissed him. After that they rarely came in contact. After it became plain that Mr. Starr's immense industry and large fortune were irretrievably lost, he openly and frequently declared that Archer had been the cause of his ruin.

It very plainly appears that after January, 1875, Mr. Starr had little or no confidence in his son Benjamin. In 1877 he took him again for a few months into partnership, but soon dismissed him. His fatherly affection for this son appears to have continued to the time of his death, although there is evidence that he complained bitterly that the family of that son had shut their door upon him.

He did not entirely lose confidence in his son Jesse till Jesse's failure as manager under the committee of creditors in 1881. Then he apparently gave up all idea of saving his property, and with a desire only to satisfy his creditors, he turned to the appellant, and, on the 10th of November in that year, wrote to him:

" You are hereby authorized to negotiate a sale of the Camden Iron Works with any parties who will assume the Drexel mortgage, the composition notes unprovided for and the manager's debts on such terms as will meet the approval of the committee of creditors."

And his son Jesse, also having in mind the importance of preventing a revival of his personal liability, also wrote:

White *v.* Starr.

"If you succeed in making the sale of the Camden Iron Works, on the terms authorized by father's letter to you of this date, I will make no claim for any of the moneys advanced by me for composition notes, or other purposes, and I will aid you or the parties with whom you negotiate in any way you may desire."

After these letters were written, the appellant entered upon a series of negotiations to effect the sale of the testator's properties, sold portions of the property and applied the proceeds to the payment of the creditors, and, without question, became Mr. Starr's reliance. It is not shown that thereafter the son Jesse took interest in his father, further than to borrow small sums of money from him from time to time. Nor does it appear that either the sons, or the grandson Archer, were ever excluded from the testator's society. They visited him when they pleased, and frequently met him upon the public highways. It is true, Jesse instances a time when he was refused admission to his father, but that turns out to have been by Mr. Starr's expressed direction, applying to that single occasion, probably because of apprehension of a further demand upon his slender purse.

When the letters last referred to were written it had become apparent that little or nothing could ever be had from Mr. Starr's estate. If anything could be saved, it would have to be done by clever management and negotiation. His sons shrank from the task, and one of them, as his letter shows, begged the appellant to take hold and save him from personal liability. With the wrecked estate the old father was also put in the keeping of the appellant and his wife, and the sons and Archer became indifferent. The situation was simply this: He had given Archer $136,000, Benjamin, $184,000, and Jesse over $80,000, and when his day of adversity came, when it was thought that his property was irretrievably lost, when his wife had died, when his importance as a citizen was gone, and when old age, with its accompanying feebleness had overtaken him, those who had profited in his prosperity held aloof, and the daughter, who had had but a pittance from his bounty, with her husband, furnished him a most comfortable home, and treated him with that tenderness and kindness which was due to an aged father.

I do not find a particle of evidence in the case which shows that Mr. Starr was not entirely satisfied with his home. On the contrary, the case abounds with proof that he was devotedly attached to it, and, as well, to his daughter, her husband and their son Jesse.

Until within two or three days of his death, and for nearly two years after the disputed will was made, he constantly visited relatives and friends, and frequented his son Benjamin's house, and it has not been even suggested that he ever uttered a complaint which would indicate that he was under coercion or an influence from which he would be glad to escape. His will of 1883 was made three months after he entered his daughter's house. What condition of mind did it exhibit? In 1879 he had made a will by which he provided that his estate should ultimately go to his children in equal shares. In 1883 the coldness of his sons and his daily contact with his daughter had naturally made the daughter more the subject of his thoughts, and the injustice of giving her an equal share with his sons, who had already partaken so largely of his bounty, became apparent to him. He saw that the amounts that the sons had been permitted to draw, when fairly considered, should be esteemed bounty, for neither they nor his son-in-law Archer had ever, in other business, evinced ability to earn more than a fraction of the sums that they had thus had. It then also was apparent that the business, which had been his pride, must be regarded as lost; that he was old, and that the estate he would leave, at best, would be small. Natural justice required that the daughter should have more of that which he left than her brothers, and he therefore gave her $25,000 advantage over them.

It was after this will was made that the appellant, after several failures, succeeded in getting up a syndicate to purchase the iron works. A proposition was made to the creditors that $225,000 would be paid to them by the appellant, if they would pay the Drexel mortgage of $100,000 (which was a lien upon the iron works) and their manager's expenses and surrender their claim. It then became known to the creditors that the appellant meant to take a conveyance of the iron works to himself and to there-

after transfer them to a corporation organized by the gentlemen who composed the syndicate, and that he would individually profit upwards of $40,000 by the transaction. They protested that the profit should be theirs, but the appellant refused to yield it to them, and they reluctantly accepted his terms. It was pending this negotiation that Mr. Starr revoked his power of attorney to the appellant, so that the appellant might be free to negotiate for his individual advantage, and then transferred and conveyed to him, not only the iron works and the chattels connected with it, but several other pieces of heavily encumbered real estate.

The proofs do not disclose the particulars of Mr. Starr's participation in this transaction, but they show that he not only signed the revocation of the power of attorney, but wrote the date in it with his own hand, and that he also executed two deeds and a bill of sale under the supervision of the committee of his creditors composed of four gentlemen of most excellent reputation and business standing, who had known him for many years and were familiar with his mental condition, yet did not hesitate to attest the execution by their signatures as witnesses, and thus vouch for the entire validity of the papers. It would be difficult, without impeaching the integrity of those gentlemen, to say that when he signed those papers he was an imbecile acting under the coercion of a son-in-law. But more than this. The impending negotiation became known to the respondent Jesse W. Starr, Jr., who, unmindful of his letter of November 10th, 1881, to which reference has been made, filed a bill in equity against his father and the creditors and the Camden Safe Deposit and Trust Company, their trustee, to restrain the proposed conveyance and the cancellation of the creditors' mortgage until the $26,000, which he claimed to have had advanced to aid in paying the second series of composition notes, had been paid, and obtaining the desired injunction, caused it to be served upon his father. There was not a suggestion in the bill that Mr. Starr was incompetent or about to act under coercion; on the contrary, the bill distinctly charged, that he was combining to do that which would deprive the son of a right. A week later, upon a contested motion, the

injunction was modified by the chancellor so as to permit Mr. Starr to convey, and then the conveyances were made. The property outside of the iron works which was conveyed to the appellant, with the exception of a portion which went to Mr. Bergen for his services, was held by him for nearly five months before any of it was sold, then but a small portion of it was conveyed away. The next sales were in December, 1884, more than a year after the appellant took title. If Mr. Starr was an imbecile and a proper subject for guardianship, the delay in parting with the property afforded his sons an abundant opportunity to have prevented the irretrievable dissipation of the property which was transferred to the appellant. They knew of the transaction and also of their father's condition; why did they fail to take action? Upon an inquisition, Mr. Starr could have been examined, and his condition could have been unerringly ascertained. It appears to me that the natural and fair inference, from their inaction at that time and from the suit instituted by the respondent Jesse, is, that Mr. Starr was competent to deal as he did with his property, and that his sons either did not think of questioning his competency and free purpose and action, or feared to do so. Two months after he made the transfers to the appellant he made a deed to the city of Camden, under the guidance of the counsel of that city, a most respectable and competent lawyer, who did not hesitate, as a master in chancery, to take his acknowledgment.

I find nothing in the case, save the general testimony as to incompetency, heretofore referred to, to show that Mr. Starr did not understand and freely make the conveyances to the appellant.

The will in dispute was made seven months later. Mr. Starr had then definitely ascertained that his remaining estate was little more than nominal. Was it unnatural that he should strike from the existing will the bequest of a sum to his daughter which was beyond the value of his estate, and was it unnatural that he should give her the residue? It is to be borne in mind that, two months before this will was made, by his own hand the testator wrote to Mr. Voorhees, who held the will of 1879:

White v. Starr.

"CAMDEN, March 12th, 1884.
"PETER L. VOORHEES, ESQ.—*Dear Sir:* Please send me by bearer, Isaac Dolson, my papers, including my deed, will and all others.
"Yours respectfully,
"JESSE W. STARR."

And that after he received that will he cut out his signature and wrote on the margin opposite the place from which he cut the signature, "Destroyed and canceled, Jesse W. Starr." This letter and cancellation are valuable, not only as evidence of competency, but also as evidence that he then contemplated testamentary provisions, and was able to write a letter of instructions to Mr. Bergen.

It was nearly two years after the transfers of October, 1883, and more than a year after the will of 1884 was made, that Mr. Browning warned the appellant that rumors were in circulation touching Mr. Starr's mental condition, and that he should take steps to have that condition authoritatively ascertained. The appellant then had conveyed land to others, and some of those who had purchased had built upon their property. It was incumbent upon him to protect the title he had given. Mr. Starr was alive, in possession of his mental faculties, and an inmate of his house. Was it not a dictate of ordinary prudence to secure evidence which would establish Mr. Starr's competency? This is not like the case of Alexander (*12 C. E. Gr. 463*), where certificates of competency were procured from experts by the principal beneficiary under a will, immediately before the will was made and in contemplation of it. Here the experts were called more than a year after the making of the will, by one who solemnly swears that, to that time, he had no knowledge of that will, but was advised of rumors of incompetency that threatened the title to lands which he was bound to defend.

The proofs disclose that the appellant took stock for a portion of the $40,000 that he secured in the sale of the iron works, and that he sold that stock for $25,000, and taking the money in actual cash placed it in a safe deposit vault, instead of to his credit in a bank; also, that he sold part of the real estate he had acquired to relatives. The sales of the real estate to relatives were of

small parcels, almost insignificant, to his mother and sister, after the death of Mr. Starr. The apparent secretion of $25,000, and the unsatisfactory account of the moneys that came to the appellant's hands, is evidence of a consciousness of precarious title to them, not only at the time of obtaining them, but also after the commencement of this litigation. The conduct may be attributed either to guilty conscience or to timidity, in contemplation of a contest with three vindictive men.

But, when not suspiciously viewed, the deposit in a vault may be explained simply as unbusiness-like management. The appellant has not made a satisfactory explanation of this circumstance, and it remains in the case, a source of doubt, suspicion and conjecture.

As the case stands, there is no direct evidence of either undue influence or fraud, and the circumstances relied upon in proof of it are, with perhaps a single exception, explainable and explained upon the hypothesis that the will was the free act of a competent testator. All that is left rests in suspicion and conjecture, which is not sufficient to satisfy the judgment that the will is the product of fraud or coercion. It appears to be impossible to accept the respondents' view of this case without imputing craft, cunning, conspiracy and perjury to gentlemen who have hitherto borne excellent characters and had the confidence of the communities in which they have lived. These characters and this confidence must have weight in this consideration. Suspicion and conjecture is not enough to destroy them.

I think that the fair preponderance of proof favors the belief that the will was the outcome of the father's apparently just conviction that it was due to his daughter. Possibly this conviction was brought about by the kindness and affection which the appellant and his wife exhibited to the old man. But influence thus acquired is not undue. *Den., Trumbull,* v. *Gibbons, 2 Zab. 117; Eddy's Case, 5 Stew. Eq. 701; Collins* v. *Osborn, 7 Stew. Eq. 511; Brick* v. *Brick, 16 Stew. Eq. 167; S. C. on appeal, 17 Stew. Eq. 282; Wheeler* v. *Whipple, 17 Stew. Eq. 141; S. C. on appeal, 18 Stew. Eq. 367; Elkinton* v. *Brick, 17 Stew. Eq. 154.*

White *v.* Starr.

*In the Matter of Humphrey's Will, 11 C. E. Gr. 513; affirmed on appeal, sub nom., Jenkins* v. *Moore, 12 C. E. Gr. 567*, Chancellor Runyon, sitting as ordinary, said : "A discrimination made by a man of the testator's age " [ninety-four years] " and in his condition " [blind] " in disposing of his estate by will, in favor of his only daughter, who has given him her whole time, and, with assiduous attention, ministered to his wants when he most needed care and sympathy, can neither be regarded as evidence of incapacity or of undue influence."

I will reverse the decree of the orphans court.