In the matter of the estate of JOHN DOLAN, deceased.

[Submitted October term, 1930.   Decided April 10th, 1931.]

*Mr. Michael J. Tansey,* for the caveator.

*Mr. John W. Slocum,* for the proponent.

PER CURIAM.

The appeal in this case is from a decree of the prerogative court affirming a decree of the orphans court of Monmouth county.   The prerogative court affirmed the decree of the orphans court upon the opinion delivered in that court by Judge Steinbach, which was as follows:

"A paper-writing, alleged to be the last will and testament of John Dolan, deceased, bearing date December 21st, 1920, was admitted to probate by the surrogate and an appeal filed within the statutory time by Michael J. Tansey, Esq.

"The caveators have admitted, through their counsel, throughout the hearing, that the testator had full mental capacity to make a will at the time of the execution of the paper-writing in question.

"It is suggested in the brief of the caveators that the will was not properly executed, in that it was not published. The attestation clause to the will is perfect. Frederick W. Hope, one of the witnesses to the will, states that he fixed up the will and put on the seal and asked the testator if he wanted to sign that now; that witness had read over the will and the attestation clause before and the testator said 'Yes;' that the testator had previously given Mr. Hope instructions as to what he wanted put in the will (page 5 of the testimony). Mr. Dolan signed the will and Mr. Hope read the attestation clause again to him and asked him whether that was his will and whether he wanted Miss Tilton and Mr. Hope to sign as witnesses, to which he said he did, and then they signed after his signing the will and both in his presence (page 6 of the testimony).

"Miss Tilton testified that Mr. Hope read the entire will over to Mr. Dolan and Mr. Dolan signed, and Mr. Hope again read the attestation clause and then 'he asked if he wanted us to sign as witnesses' (page 17 of the testimony). Miss Tilton did not think that the testator said what it was after he had signed the document, but that he did say: 'It is just the way I want it.' (Miss Tilton was the stenographer who wrote out the will.)

"It seems to me that this testimony coupled with the perfect attestation clause is sufficient to show that the will was duly executed.

"There remains to be disposed of the question as to whether or not there was undue influence.

"The caveators have gone far back into the history of the relations of the testator with other members of his family. It seems that as far back as 1888, Ella Maloney went to live with her uncle; her sister, Mary Maloney, was already living with her uncle. At the same time Ella went to live with her uncle, her brother, Michael, went to live with him.

A few years later, Margaret Maloney, another sister, went to live with them and her uncle. At that time Bridget Dolan, the mother of the testator, was alive and living in the same household.

"The testator died July 12th, 1927. He was never married. A great deal of testimony has been offered as to the various family quarrels and differences of opinion. Many of them taking place many years ago, but running through the entire testimony, it seems clear that there has been some feeling between that branch of the family, the members of which were the beneficiaries under the will of the testator, and the other members of the family. Testimony has been offered to show that Ella Maloney and Mary Maloney dominated their uncle to the extent that they openly quarreled with him; that a serious quarrel once took place between Michael Maloney and his uncle, the testator, which resulted in Michael Maloney leaving the farm and never returning to live there, and testimony has been offered to show that Mary Maloney and Ella Maloney both treated other members of the family at various times with decided coolness when they came to the home of their uncle, the testator.

"Testimony has been offered to show that the conduct of those who were beneficiaries under the testator's will did not show them to be always as kindly and as thoughful of their uncle as they might have been.

"Some of the testimony offered on these various matters has been denied. It does appear that the testator operated his farm to the year 1925 when he sold the live stock and personal property and moved from the farm; that he conducted business up to this time with various persons who were not otherwise connected with his affairs and that he seemed to them to fully understand his business transactions and able to determine them according to his own wishes; that he went into the office of the lawyer who drew his will unaccompanied; that the lawyer did not have any personal acquaintance with any of the relatives of the testator; that he took full directions for the drawing of the will and the names

of the beneficiaries from the testator's own lips when he was alone with the testator; that after that, Ella Maloney was shown the will by the testator and she communicated some information as to its contents to her sister Mary, who was much displeased; that Michael, one of the beneficiaries, had become friendly again with his uncle and that his uncle had, on at least one occasion, that is, the request for the loan of money on a second mortgage to his nephew Michael, refused the same and refused to help Michael unless Michael would act in Michael's business transactions as his uncle suggested. Michael would not, and therefore his uncle did not assist him.

"It seems clear that there was not undue influence exercised by Michael and Mary. No specific acts are shown as to Mrs. Harrington, excepting the kindness to her uncle in his last years. Ella's acts toward her uncle in his last years seemed to have been those of kindness. Her duties as a school teacher kept her away from her uncle for periods throughout the week but she came to him even in the final years at week-ends.

"Surely, those to whom he left his estate were the closest of his relatives in association with him.

"I do not believe the record shows that there was any undue influence. There may have been opportunity for the use of undue influence, and there may have been an unfriendly feeling existing between the Maloney branch of the family and certain other members of the family, but all this time the testator seems to have been unrestrained in his connections and in his inclinations.

No direct undue influence has been shown. There does not seem to have been sufficient restraint put upon the testator to raise a presumption of undue influence on the part of anyone. Such acts as have shown the testator's regard for and an inclination to please certain persons during his lifetime were carried out by his will and may have been to some extent occasioned by the close relationship he maintained with them during his lifetime.

"The testator had sufficient mental testamentary capacity, the will was formally and properly executed and no undue influence was used to obtain its execution.

"The appeal is dismissed and the probate of the will affirmed.

"An order may be settled upon notice in accordance with these findings, at which time application may be made for counsel fees and disbursements."

We concur in the view of the prerogative court that the decree of the orphans court was properly made, and are satisfied to rest our conclusion upon the opinion of Judge Steinbach.

The decree under review will be affirmed.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, CAMPBELL, LLOYD, CASE, BODINE, DALY, DONGES, VAN BUSKIRK, KAYS, DEAR, WELLS, JJ. 13.

*For reversal*—None.