Dumont *v.* Dumont.

WILLIAM H. DUMONT, appellant,

*v.*

THEODORE S. DUMONT and CHARLES A. ROBBINS, executors, &c., respondents.

1. The party alleging undue influence must prove it, either directly or by establishing such circumstances as will warrant a presumption against the instrument, which in the absence of affirmative evidence, showing that the paper was the spontaneous act of the testator, must control as a conclusion of fact.

2. The mere fact that a favored legatee and devisee openly denounces one who is discriminated against, to a testatrix who is well in body and strong in mind, and surrounded by friends, and within reach of the protection of the very man who is denounced, is not sufficient proof to create a presumption against the instrument.

3. It is as much the duty of courts to uphold the right of the·owner of the property to dispose of it by will, according to his pleasure, as it is to see that he is not imposed upon in the exercise of that right.

4. It is only upon allegations of fraud that the courts will inquire into the reasons for changes and inequalities in testamentary dispositions, and then they will consider them merely in connection with, and as corroborative of, proofs which tend to show that they were not the voluntary act of the person who made them.

5. *Held*, under the circumstances of this case, that the will in question was not the product of undue influence.

On appeal from a decree of the Union county orphans court, admitting to probate the will of Mary D. Dumont.

*Mr. C. W. Riker*, for the appellant.

*Mr. Cranston* and *Mr. Abel I. Smith*, for the respondents.

THE ORDINARY.

Mary D. Dumont, the widow of Robert Dumont, executed the paper in dispute as her last will and testament, at her residence in Summit, in Union county, in this State, on·the 11th day of April, 1884. She was then about seventy-three years of age. Her husband had died on the 4th day of the preceding January, at the age of seventy-eight years. After the execution of this paper, she lived in the full enjoyment of her faculties for two years and eight months, dying of heart failure on December 9th, 1886.

At the time the will was made, and at her death, her next of kin were her two sons, William H. and Theodore S. Dumont, her daughter, Henrietta S., the wife of Charles A. Robbins, and her grandson, Robert Foote, who was the son of a deceased daughter.

Robert Dumont, the husband of the testatrix, was a custom-house broker in New York city. He started in business there

in 1850, in partnership with one Schuyler, under the firm name Schuyler & Dumont. When Mr. Schuyler died, he took his son Robert in partnership with him, under the firm name Robert Dumont & Son. In 1872, the son Robert's health had become impaired to such an extent that it became necessary to send for William H. Dumont, who was then a clerk in Cincinnati, and make him an assistant of the firm. In 1873 the junior Robert died, and William became his father's partner in his brother's stead, under an agreement by which he was to have twenty-five per cent. of the profits of the firm. This arrangement continued until 1880, when William shared the profits equally with his father. After that time, although the father attended daily at the office of the firm, because of his advancing age, the brunt of the work devolved upon William. William proved to be an efficient manager, and under him the business became more profitable than it had ever been before. During the last year of the father's life, 1883, the profits amounted to more than $11,000. The business was of a character that required no capital. The long continuance of the firm had given it a reputation and standing that brought to it a valuable and substantial patronage. The junior Robert's estate, made in it, amounting to about $15,000, was bequeathed to his mother, and the father's savings also went to the same person. The moneys from these sources, together with a small inheritance and some profits from investments, made up the estate which the instrument now assailed seeks to dispose of. From 1872 to 1879, William lived with his mother and father. His wife died before 1872, leaving him with two daughters. One of these daughters, Elizabeth, resided with him at his father's home, and the other, Mary, was sent away to school. In 1879 he married again, and then provided a home for himself and his family at Madison, New Jersey.

Theodore Dumont left his father's house when he was a boy, and, after living at various places for many years, in 1880 returned home to live, and from that time resided with his father and mother until they both died. During the time he resided with them he was engaged in profitable business in New York

15

as a railroad agent. He was then married, but was childless and separated from his wife.

Henrietta Dumont married Charles A. Robbins in 1883. Robbins was then a clerk in Theodore Dumont's office, and he yet remains in that employment. After Henrietta's marriage she and her husband boarded with her father and mother until both the father and mother died.

The grandson, Robert Foote, resided with his father in Morristown. His mother, who was a daughter of the testatrix, died in 1865. Mr. Foote is a man of wealth, and has already made his son independent. The means and future expectations of Robert Foote during his grandmother's life were such that he did not expect, and was not expected, to share in her estate.

The fair value of Mrs. Dumont's property is about $45,000.

The disputed will makes this disposition of it:

*First.* It directs that the debts and funeral expenses be paid.

*Second.* It bequeaths all household furniture, pictures, silver and plated ware, wearing apparel, jewelry and books to the daughter, Henrietta.

*Third.* It bequeaths $5,000 to the executors in trust to pay the income to Elizabeth, William's daughter, until her father shall die or she shall marry, and upon the happening of either of those events, to pay to her the principal. If she shall die before she takes the principal, her sister, Mary, is to be substituted for her as *cestui que trust*, and take the income until she marries or her father dies, and then the principal.

*Fourth.* It bequeaths $1,000 to the son William, adding to that bequest this language:

"I thus give to my said son William, a sum estimated to be less than that given to my other children, for the reason that he succeeded to the business built up in part by my late husband, in the city of New York, which was a valuable business, and in the good will of which my other children have had no share."

*Fifth.* The residue of the estate is divided equally between the son Theodore and the daughter Henrietta.

*Sixth.* The sons, Theodore and William, and the son-in-law, Charles A. Robbins, are made executors, with power to sell real estate.

The admission of this paper to probate is resisted by William H. Dumont, on the grounds that the will was not properly executed and his mother was unduly influenced to make it. The orphans court, by its decree, determined that the will should be admitted to probate, and from that part of the decree this appeal is taken.

It appears, beyond dispute, that the paper was properly executed as a will. Both of the subscribing witnesses were examined, and testified to a full compliance with all the statute's requirements.

The real contention has been over the question, whether the will was the product of undue influence.

The evidence discloses, that immediately after the death of Robert Dumont, and before his burial, Theodore Dumont, conceiving that his brother William should make some compensation for the father's business to which he was about to succeed, asked him what income he proposed to allow their mother from the business, and that, after some conversation, William, appearing to acquiesce in the reasonableness of the demand, suggested that the allowance would be $150 a month as long as the mother lived. This was satisfactory to Theodore, and he assured his brother that he and their sister would release all interest they had in the business.

After the father's funeral William wrote to Theodore that he did not recognize Theodore's right to speak for their mother; that the arrangement that had been made would not be carried out, and that he would treat directly with the mother with reference to her affairs. Shortly after this letter was written the brothers met on a ferry-boat, and there had an angry discussion about William's duty to pay his mother an annuity from the business, and parted in enmity. Theodore subsequently narrated to his mother all that had transpired at these interviews with William.

In the latter part of January, William also spoke to his mother about them, and then denied her legal right to any interest in his business, but at the same time assured her that if her income should not be sufficient to support her, he would make up any deficiency. His mother at once declared that his offer was not satisfactory, and insisted that in justice a certain income from the business should be paid to her.

After this interview with William, Mrs. Dumont appears to have consulted with her son-in-law, the father of Robert Foote, who advised that William was not legally bound to pay any-thing for the business to which he succeeded, but that he must account for past profits. Mr. Foote offered to examine the firm books, to ascertain the state of the accounts. Mrs. Dumont, however, refused to allow such examination to be made, because it would seem to question William's integrity. Though she considered the question of her legal right to compensation for her husband's business as settled by Mr. Foote's advice, she appears, nevertheless, to have persisted in the belief that William was at least under moral obligation to make such compensation.

She, then, was undoubtedly possessed of a clear mind and strong will.

After the quarrel on the ferry-boat the brothers did not speak to each other. Theodore continued to reside with his mother, and William frequently visited her. To each son she exhibited the same motherly affection, though she took her securities from William and put them in a safe deposit vault, and to a considerable extent entrusted the collection of her income to Theodore. The sons, upon their part, both exhibited affection for the mother.

Mrs. Dumont made three wills. One in 1871, another in 1881, and the paper in dispute, and it is a significant circumstance that in each of them there was inequality of distribution, induced by that which appeared to her to be just. When the will of 1871 was made, her son Robert, though living, anticipated speedy death from an incurable disease; her daughter was unmarried and dependent upon her; young Foote was rich, and her two sons were able to earn their own livelihood. She then

gave one-half her estate to her daughter, and one-fourth of it to each of her sons, William and Theodore.

When the will of 1881 was made, the son Robert had died, her husband had grown old, her estate was larger, her daughter was unmarried, and it had become doubtful whether she would marry, and her sons were each successful in business. She then provided that her husband should have her property for his life, and that at his death her daughter should have her household furniture and the income of the residue of the estate for life, or until she should marry, and upon the daughter's marriage the residue of the estate was disposed of for the equal benefit of the daughter and sons.

Each will exhibits internal evidence of full consideration of the elements that characterize testamentary capacity, and tends to prove a sound and disposing mind.

The paper in dispute is in character similar to the wills which preceded it. When it was made the husband was dead, the daughter had married, young Foote was independently rich, and William had succeeded to a lucrative business that his father had been building up for many years, without paying for it. That business had supported the testatrix and her family for all those years, and the bulk of the estate that she had to dispose of came from it.

From her standpoint the will was not inequitable.

But it was urged that the will was the product of Theodore's undue influence. No direct evidence of his exercise of such influence is produced. It is claimed, however, that the proofs establish that he was constantly with his mother; that he controlled her business; that he was so violent in his temper that she feared him; that he boasted of his influence over her, and that he would have her make a will which would discriminate against his brother; that he hated his brother; that he sent his own lawyer from New York to Summit to draw her will, with instructions as to the provisions it was to contain; that he paid the lawyer for his services; that he procured a physician as a witness to the will, and afterwards boasted that the physician's presence would preclude a contest touching his mother's capacity.

In *Den, Trumbull et al.* v. *Gibbons, 2 Zab. 117, 136,* Chief-Justice Green charged the jury in the following language: "The influence of affection, of kind offices, even of persuasion, does not invalidate a will, otherwise the very motive of the testator's benevolence would make void the gift. The influence which the law denounces as undue influence over a testator must be such as to destroy his free agency, and amount to moral and physical coercion; it must be proved, moreover, that the act done was the result of such coercion; there must be a control exercised over the mind of the testator, or an importunity practiced which he could not resist, or to which he yielded for the sake of peace."

In *Haydock* v. *Haydock, 6 Stew. Eq. 494, 496; affirmed on appeal, 7 Stew. Eq. 570,* Vice-Chancellor Van Fleet said that no definition of that which the law denominates undue influence can be given which will furnish a safe and reliable test for every case. He adds: "All that can be said in the way of formulating a general rule on this subject is, that whatever destroys free agency and constrains the person, whose act is brought in judgment, to do what is against his will, and what he would not have done if left to himself, is undue influence, whether the control be exercised by physical force, threats, importunity, or any other species of mental or physical coercion. The extent or degree of the influence is quite immaterial, for the test always is, Was the influence, whether slight or powerful, sufficient to destroy free agency, so that the act put in judgment was the result of the domination of the mind of another rather than the expression of the will and mind of the actor."

The party alleging undue influence must prove it, either directly or by establishing such circumstances as will warrant a presumption against the instrument, which in the absence of affirmative evidence, showing that the paper was the spontaneous act of the testator, must control as a conclusion of fact. *Earle* v. *Norfolk, 9 Stew. Eq. 188, 192; Rusling* v. *Rusling, 9 Stew. Eq. 603; Dale* v. *Dale, 11 Stew. Eq. 274; Waddington* v. *Buzby, 16 Stew. Eq. 154; Brick* v. *Brick, 16 Stew. Eq. 167; Wheeler* v. *Whipple, 17 Stew. Eq. 141.*

---

---

It is claimed that the circumstances above referred to are established by the proofs, and that they justify the rejection of the paper in dispute.

I do not think that the proofs warrant me in finding the facts to be as they are insisted upon.

It has been clearly shown that Theodore lived with his mother, and that he was much in her society; also, that he continually assisted her in managing her business affairs. When he collected her income he deposited it with bankers in New York, from whom she drew it by check at her pleasure. The mother did not know the amount of her income. If she questioned as to her ability to make an expenditure, Theodore uniformly told her not to stint herself, to buy whatever she wished, and he so managed that her bank account was inexhaustible by her wants. He was profane, but rarely ever uttered an oath in her presence. When he entered or left the house he would kiss her. In the evening he would sit with her and read to her. The case abounds in proofs of his solicitous and tender devotion to her.

The only suggestion of her possible fear of him is, that she desired him to be consulted before guests were invited to the house, and sought to keep from him annoyances that would excite him.

That he had a violent temper cannot be doubted, but that his mother stood in fear of him is not satisfactorily shown. Her deference to him, and her anxiety that he should not be annoyed, may be attributed to love as well as to fear.

It is abundantly proved that he was angry with his brother. He does not hesitate to admit it. Whether he was right or wrong in his conclusion, he seems to have been firmly convinced that William should have made some compensation for the business to which he succeeded. Hot words had passed between him and William, and they evidently rankled in his mind, yet the facts that he was content that his brother's daughter, Elizabeth, should have a considerable legacy, and that he assisted his mother to make up a deposit of $500 in a savings bank for another of the brother's children, indicate that he was not disposed to be unjustly vindictive. His desire seemed to be to compel William

to do that which he considered fair. He made no attempt to exclude him from his mother's society. William constantly visited his mother, and had private interviews with her. The mother frankly told him what she considered his duty to be, and thus gave him full opportunity to disabuse her mind of any misapprehensions or prejudice that she might have. If she was under Theodore's coercion he could see it, and had ample opportunity to afford her a refuge from it. He himself tells of the interview with his mother where she demanded an annuity, and he denied her legal right to it, and offered to make up any deficiency in her income, and where she rejected his offer, stigmatizing it as a tender of charity. The denial of her legal right, and the making such an offer, evidently did not weaken her belief in the justness of her position, and her indignant rejection of the offer, in a private interview with him, was not the act of one who was under coercion.

The will was drawn by James S. Greves, a member of the New York bar of some twenty years' standing. He had lived at Summit, and had some acquaintance with the Dumont family. Theodore employed him in two matters of his own, and upon an occasion when he was in Theodore's office told him that Mrs. Dumont desired him to draw her will. Mr. Greves asked what disposition Mrs. Dumont would make of her property, and he replied that she would make some bequests, among them one giving William's daughter $5,000, and then divide the residue of the estate between himself and his sister. The witness says that this information was general, and that nothing derogatory to William was said. He states that he then told Theodore that he expected to go to Summit soon and would stop and see Mrs. Dumont, and that he did not then know of the differences that existed between the brothers. A few days later he went to Summit and called upon Mrs. Dumont. Mrs. Dumont asked if Theodore had told him what provision she desired to make of her property, and he answered that he had been told only in a general way, and then Mrs. Dumont proceeded to instruct him. In course of this instruction she said: "As to Willie, I hardly know what I ought to give him; I do not know whether

Dumont *v.* Dumont.

$1,000 would be enough. What do you think?" The witness said that he could not advise her, that he did not know the amount of her estate. She then said that her property was worth about $40,000, and added (using the language of the witness):

"Willie did not do right by his father in his lifetime, and Mr. Dumont has often come home and told me, sometimes with tears in his eyes, that Willie was treating him badly in his business; that he was constantly drawing from the business more than his agreed share of the profits, both when he had a third interest and when he had a half interest, and that he had never accounted in any way for the value of the business which her husband had built up during his long years of attendance to it, and the other children had received no share of it, and she had received no share of it, and she deemed that Willie had received a full share already, and $1,000 is enough; give him $1,000."

She then expressed a desire to explain her reasons for discriminating against William, and the witness prepared the explanation that appears in the will and had been already quoted, first writing it upon a piece of paper and submitting it to her for approval, and then copying it in the will. This witness also testifies that Mrs. Dumont said that her husband's business was well worth $10,000 a year to William. His recollection is, that when the document was finished he asked who would be the other witness to it, and Mrs. Dumont answered that Dr. Risk would soon be in and that he would act.

Dr. Risk is a physician who had then been thirteen years in practice in Summit. At that time he was in daily attendance upon Mrs. Robbins, whose child was less than two weeks old. The doctor testifies that as he came from Mrs. Robbins's room, after his usual visit, he was called into the library to witness the will. He says that he did not come to the house by special appointment, or at any designated time, and did not know that Mr. Greves was in the house till he was called into the library. He had no conversation with Mrs. Dumont. She appeared to him to be perfectly calm and collected, showing no trace of excitement. He says that he knew her to be well and of clear mind, because, about that time, in his calls upon her daughter, he saw her constantly.

Both these gentlemen appear to be witnesses of the highest character. Neither is impeached or contradicted. Both speak frankly and apparently truthfully. I see no reason why their testimony should be doubted.

Theodore swears that he had only one conversation with his mother upon the subject of making her will, and he states that conversation, and the circumstances surrounding it, as follows :

" One evening, in the library, mother and I were sitting there alone, as was our usual custom; the conversation turned on Bessie, William's daughter; she was away at school, in a convent at Montreal; she made the remark, 'After I am gone I am afraid Bessie will have a hard time of it; she will have no friend but you (meaning me) ; she is as dear to me as one of my own children, and I think I shall do something for her ; ' I said, ' In what way, Mammy ? ' she replied, ' I think I ought to make a new will, and provide something for Bessie ; ' I said, ' That would not be a bad idea ; ' she said, ' How much do you think I ought to give her ? ' I said, ' In my will I have given her $5,000 ; you can do as you please ; ' she then said, ' In getting the business, I think Willie has had his full share and I think the most of what I have should go to Nettie and you ; will you have a new will drawn ? ' I said, ' No, Mammy, I will have nothing to do with your will whatever; this property is all yours, to do with as you please; you can spend it, give it away or burn it up, and I think if you go to make a will it would not be right or proper for you to counsel or advise with me or any one else; you should be governed entirely by what your heart and judgment dictates ; ' I then said, ' I met Sanford Greves on the train the other night, and I think he is staying here at his aunt's—you know him—and the next time I meet him I will tell him that you want to see him in regard to drawing your will ; ' she said, ' Very well.' "

He says that this was the entire and only conversation he had with his mother upon the subject of her will until after the paper in dispute was made and executed. The first night he was at home after the will was drawn, he states an interview between himself and his mother as follows :

"After we had gone into the library, as usual, she took her seat; I was sitting there ; finally she took a paper out of her pocket and, I think, she said, ' Sanford Greves '—she may have said ' Mr. Greves,' but I think she said ' Sanford Greves '—'has been here to-day, and I have made a new will; I wish you would take it to New York with you in the morning and lock it in your safe until I come to town, when I will put it into my own ; ' the will, if I remember correctly, was not in an envelope ; I said, ' Well, I suppose I had

better put it into an envelope and seal it up?' she said, 'Yes;' I said, 'Shall I read it?' she said, 'If you care to;' I read it and said I would attend to it, and put it in my pocket."

He adds that he subsequently took it to New York and locked it up in his safe in the vaults of the Safe Deposit Company, where it remained until his mother visited New York and transferred it to her own safe, and there it was found by him and Mr. Robbins after his mother's death.

The testimony that Theodore boasted of his influence over his mother, that he would procure her to make a will, and that the presence of the physician as a witness would determine the question as to capacity, comes from one who was once Theodore's firm friend, but has quarreled with him and become his enemy. In many particulars the statements of this witness are inherently improbable. He is contradicted by Theodore, and, on some points, by others. I do not think that I am justified in relying upon his unsupported statements as to the declarations that Theodore made, in face of Theodore's complete denial of them.

I think that the case proved is fairly resolved to this state of facts: Mrs. Dumont was in the full enjoyment of her mental power and possessed of considerable strength of will. Theodore was greatly incensed at what he thought to be his brother's injustice, and he did not hesitate to denounce it to his mother. Mrs. Dumont shared his sentiments, possibly being influenced to some extent by his denunciations of William's conduct. His constant companionship with her, his uniform affection, and his many kind offices, undoubtedly added weight to his opinions. After the will was made Mrs. Dumont lived nearly two years, and during that time constantly had private interviews with William, yet never intimated to him that she desired to change her will.

The mere fact that a favored legatee and devisee denounces one who is discriminated against, to a testatrix who is well in body and strong in mind, and surrounded by friends, and within reach of the protection of the very man who is denounced, is not sufficient proof to create a presumption against the instrument. The other circumstances insisted upon are not sustained by the proofs. That Theodore Dumont may have desired his mother to make her will

as she made it, and had opportunity to urge that desire, will not establish undue influence. *Turnure* v. *Turnure, 8 Stew. Eq. 437; S. C. on appeal, 10 Stew. Eq. 629.*

Mrs. Dumont forcibly made known to the appellant, in a private interview, the conviction that led to 'the discrimination against him, and subsequently reiterated it in her will. It is not for this court to inquire into the justness of her position. It is as much the duty of courts to uphold the right of the owner of property to dispose of it by will, according to his pleasure, as it is to see that he is not imposed upon in the exercise of that right. *Wintermute* v. *Wilson, 1 Stew. Eq. 437; Kitchel* v. *Beach, 8 Stew. Eq. 458.* It is only upon allegations of fraud that the courts will inquire into the reasons for changes and inequalities in testamentary disposition, and then they will consider them merely in connection with, and as corroborative of, proofs which tend to show that they were not the voluntary act of the person who made them. *Dale* v. *Dale, supra.*

The decree of the orphans court will be affirmed.