This is an appeal from a decree of the Monmouth County Orphans Court admitting to probate a will and two codicils of Edward Hidden Raynolds, late of Allenhurst, Monmouth County, New Jersey. The will in controversy was executed on June 30th, 1936, the first codicil thereto on March 2d 1937, and the second codicil on February 21st, 1939. Mr. Raynolds died on March 14th, 1940, at the age of eighty-two years. He was a man of exceptional mental and physical vigor, attending daily, until his retirement, to his duties as president and chairman of the board of directors of DeVoe Raynolds Company, one of the largest paint and varnish manufacturers in this country. He was stricken only four days before his death and prior to that time had remained in full possession of his mental and physical powers. He was a leading executive, a man of parts who dealt daily with men, business and the problems of life. Although he retired prior to 1922, he still maintained his prior interests and activities in domestic and worldly affairs. He was described by his attorney as "a high-type chief executive," and at the time of his death, and long prior thereto, he was a man of considerable wealth.
The testator was twice married, his first wife having died about 1897 or 1898, leaving two children, Edward F. Raynolds, born August 6th, 1889, and Harold Raynolds, born October 29th, 1894, the appellants in this cause. After the death of the first Mrs. Raynolds, the testator remarried, his second wife being Madeleine Taitt Raynolds. Of the second marriage three sons were born; Arthur, now about forty-one years of age; Reginald, now about forty years of age, and Lawrence, about thirty-seven. Upon his remarriage testator, his wife and two sons resided together, and according to the uncontradicted testimony, both the testator and his wife were very kind and affectionate towards these children, and the *Page 143 
testator remained so until his death. However, shortly after the birth of her first child, the attitude of Madeleine Taitt Raynolds changed. With the happening of that event, she apparently lost interest in the welfare and happiness of her two step-children, and her affection for them waned. She complained to the testator continuously, according to the proofs, about almost everything his sons by the first wife did. And, also according to the proofs, the father listened to these complaints, and invariably, in response thereto requested the boys to discontinue doing whatever was the subject of his wife's complaint, "to keep peace in the family."
Mr. Raynolds during his school days had been a track star, and was athletically inclined. He was interested in the athletic exploits of his boys, and he frequently told them he would be present at various athletic events important in their school careers, but at the last minute he would cancel the engagement, saying, "I cannot come, your stepmother objects, and I cannot come." Prior to each event in the lives of these boys, such as athletic contests, concerts, military drills, graduations from schools and colleges, the testator would indicate a desire and intention to attend, only to decline at the last minute "because your stepmother objects and I want to keep peace in the family." Both boys served overseas in the first World War. Testator promised to go to the boat to see them leave, but later withdrew his promise, saying that Mrs. Raynolds objected. When these boys returned from the war, although apprised of the date and hour of their return, he was not present at the dock to greet either of them. Only once in this long period did he accede to the wishes of either of his two oldest sons over the objection of their stepmother. That was on the occasion of the marriage of his son Harold in January, 1923, when he attended the wedding in spite of Mrs. Raynolds' objections.
In the matter of education, position and monetary benefits, Madeleine Taitt Raynolds was constantly attempting to improve the status of her own three sons to the discomfort and detriment of her stepchildren. This oppressive conduct included objections to the children's birthday and Christmas parties, objections to assistance by their father in the preparation *Page 144 
of school lessons, failure to give them proper care and attention during illness, and refusals to allow them to accompany their father, stepmother and half-brothers for automobile rides. The three younger children were permitted a Christmas tree in their mother's room, but the two stepsons were neither permitted to participate in those festivities nor to have another tree of their own in the house. They were sent to their aunt's for their Christmas celebration. Nor were they ever permitted to have that equally important child's delight, a birthday party. This discrimination between the two sets of children continued throughout her lifetime.
In 1915, Harold inherited $100,000 from his mother and about 1920 he received an additional inheritance of $110,000 from his maternal grandmother, after which his stepmother required him to pay $100 per month for his room and board. Edward, likewise, received $100,000 from the estate of his mother and $110,000 from the estate of his maternal grandmother. After these two inheritances totaling $210,000 to each of the two first born, Mrs. Raynolds made frequent references to the wealth of both Harold and Edward, as contrasted with the position of her three sons. According to one witness, joking remarks would frequently be made by various members of the family concerning the amount of money Harold and Edward had. During the period of financial turbulence after World War I, Harold lost his entire fortune, although he had and still has the position of manager of the Newark branch of DeVoe Raynolds Company, an important and substantial situation. Conditions were so unpleasant, even when Harold was a full grown man, that when he arrived home from South America, where he had been employed, ill with tropical fever, he received such poor treatment at his father's home that he was forced to move to the Cornell Club.
The testimony of Edward F. Raynolds as to the continuous course of prejudicial practices of Mrs. Raynolds is substantially similar to that of Harold. In addition thereto, Edward, more familiarly known as Teddy, states that he was employed in the DeVoe Raynolds' Newark plant for one and a half years, without salary, because his stepmother objected to his being paid. At the expiration of that time and at his stepmother's *Page 145 
suggestion he took a six months' trip to Europe. At the time of his father's death, Edward's fortune had considerably dwindled, nevertheless he still retained of his principal some $70,000.
The foregoing recital of facts is fully supported by appellant's proofs, which are not controverted. The appellees, proponents of the will and codicils, offered no proofs except the documents involved and the testimony of one witness, Richard T. Greene, Esq., of the New York bar, a man of unimpeachable reputation and integrity, with fifty years of experience as a practitioner, who testified concerning the execution of the numerous wills and codicils of the testator drawn by him since the year 1922. He represented the testator in legal matters generally from 1924 or 1925, and occasionally prior thereto, to the date of his death. Mr. Greene testified, in part, as follows: "He made up his own mind as to what he wanted to do, substantially, in regard to all of the wills and all of the codicils that I drew. * * * He took enough time to discuss the particular matter that I was handling for him * * *. Enough time to confer and discuss these matters and little time for extraneous things. He knew the value of his own time and a lawyer's time. * * * Crisp in his talk. * * * He even learned to play chess before [within] two or three years of his death. At my suggestion, he took it up, and learned to play a pretty good game. * * * Yes, he was a positive character. He knew what he wanted and did what he wanted, and I never noticed that he was influenced by anyone else, and he was influenced by me only when I made suggestions in a legal way; that was what he was paying me for."
From the testimony of her stepsons we have a vivid picture of the unpleasant side of Madeleine Taitt Raynolds, as they viewed her. "A woman," as counsel for the contestants paraphrase it in their illuminating brief, "engaged in the double endeavor of alienating the testator's natural affections from his two first-born, and transferring them to the three children of his second marriage. So persistent and so uncompromising was her campaign of seduction of a father's natural love that in the course of a little time she had so conditioned the testator's *Page 146 
mind that he was hopelessly standing by and allowing outrage after outrage to be perpetrated upon his motherless boys, even at a time when they were at a tender age." A woman whose influence remained "as effectively as though she continued alive, her imperious personality survived her demise and continued to dominate the life and soul and acts of her surviving spouse." A woman of unparalleled warped and unnatural antipathy for her stepsons with a complete lack of human consideration for their welfare. Such is the word picture of the testator's second wife, stepmother to the appellants. The picture of the testator drawn by the appellant's counsel is more lovable, although none the less vivid. He is depicted domestically as a kindly and much-abused old gentleman, a brow-beaten, docile, and spineless jellyfish of a man who had not the strength or courage to resist his wife's criticism or argument. And this notwithstanding the undisputed proofs that in the outside world he was a man strong in mind and body until shortly before his death, a vigorous and virile executive, one who attended to his business affairs efficiently, got about New York, lunched with his sons and consulted with his lawyers, played a game or two of chess, and in short, occupied himself with the duties and pleasures which are the province of a well-to-do retired gentleman.
But argument is not evidence, and while the arguments of counsel for appellants are persuasive, the evidence is not. Here was no sickly, senile individual dependent upon others for the necessaries and comforts of mind and body, who could easily be importuned by those who surrounded him. He was completely free for intercourse with the world and exercised that freedom constantly. If the evidence were as strong as counsel's arguments and apparent convictions, the court would have no difficulty in drawing the same inferences which form the basis of counsel's arguments. But these arguments are grounded in inference and conjecture which do not support the posited conclusions. "The circumstances upon which a conclusion is based must themselves be facts; they are of no value if they in turn are based upon a conjecture or assumption." In re Le Van, 123 N.J. Eq. 463, 469;affirmed, 125 N.J. Eq. 92. And it may be here noted that except for *Page 147 
the insistent and able argument of counsel for appellants, this case might well have been affirmed on the opinion of the master.
The exact number of wills and codicils which testator executed during his lifetime is not known. It is fairly certain that he made one or more wills and codicils prior to 1922. However, in 1922, Richard Greene was employed by the testator for the first time for the purpose of drawing a new will, although he had previously been employed by the testator in other legal matters. From December 13th, 1922, to June 30th, 1936, Mr. Greene drew for the testator a total of seven wills and eight codicils. The tenor of the prior wills and codicils with relation to those attacked in this case will be more fully discussed hereafter.
There is but one question before me, namely, did Madeleine Taitt Raynolds exert undue influence upon her husband, Edward Hidden Raynolds, in the preparation and execution of his will?
PRESUMPTION OF VALIDITY OF WILL AND BURDEN OF PROOF.
It is, of course, elementary that there is a presumption of law in favor of the validity of a will, and he who contests it must clearly establish facts to overcome that presumption. Elkinton
v. Brick, 44 N.J. Eq. 154; In re Babcock, 106 N.J. Eq. 228; Inre Halton, 111 N.J. Eq. 143; In re Merkel, 4 N.J. Mis. R. 656.
Likewise the burden of proving undue influence is upon him who asserts it. Kise v. Heath, 33 N.J. Eq. 239; Earle v.Norfolk, 36 N.J. Eq. 188, 192; affirmed, 37 N.J. Eq. 315;Wheeler v. Whipple, 44 N.J. Eq. 141; affirmed, 45 N.J. Eq. 367;Dumont v. Dumont, 46 N.J. Eq. 223; Schuchhardt v.Schuchhardt, 62 N.J. Eq. 710; In re Eatley's Will, 82 N.J. Eq. 591; Shotwell v. Shotwell, 85 N.J. Eq. 101, 103; affirmed,85 N.J. Eq. 594; In re Craft's Estate, 85 N.J. Eq. 125; In reBottier, 106 N.J. Eq. 226; In re Cassidy, 4 N.J. Mis. R. 1014; Inre Strang, 109 N.J. Eq. 523. And the one asserting it must establish it clearly. In re Babcock, supra; Dumont v. Dumont,supra. *Page 148 
Appellants urge that the burden of proof here shifts to the proponents to show that the execution of this will by Mr. Raynolds was free from any undue influence exerted by his wife. This, they contend, results from the fact that a confidential relationship by virtue of the marital status existed between Mr. and Mrs. Raynolds, and that such relationship, coupled with any of the indicia of undue influence, or other slight circumstances, is sufficient to shift this burden, citing Loveridge v. Brown,98 N.J. Eq. 381. The other "slight circumstances" or "indicia" which must exist in order that the burden of proof shifts to the proponents, are recited in In re Barnett, 2 N.J. Mis. R. 135
(at p. 142), as follows:
"It has been said that in order to shift the burden of proof to a proponent of a will, on an issue of undue influence, there must be some other elements `added to proof that testator's mind was enfeebled so that it was difficult to resist improper influence and the establishment of intimate confidential relationship.' It is said that `slight circumstances are sufficient to be added. Among the elements which may be thus added, which have been mentioned in the authorities, are these: (1) the initiation of proceedings for the preparation of the instrument; (2) participation in such preparation; (3) presence at the execution of the will; (4) efforts to exclude the natural objects of testator's bounty from his society; (5) concealing the making of the will; and (6) taking possession of the will. Wheeler v.Whipple, 44 N.J. Eq. 145; In re Howard, 9 N.J.L.J. 144; Cooper'sWill, 75 N.J. Eq. 177; 76 N.J. Eq. 614; Morrisy's Will,111 Atl. Rep. 26."
See, also, Dale v. Dale, 38 N.J. Eq. 274; Waddington v.Buzby, 43 N.J. Eq. 154 (the decree of the Prerogative Court denying probate to the will was reversed in 45 N.J. Eq. 13);Fritz v. Turner, 46 N.J. Eq. 515 (reversed for want of full and proper hearing, 49 N.J. Eq. 343); Carroll v. Hause,48 N.J. Eq. 269; Spark's Case, 63 N.J. Eq. 242; Zelozoskei v.Mason, 64 N.J. Eq. 327; In re Tunison's Will, 83 N.J. Eq. 277;In re Castellano, 115 N.J. Eq. 356.
From the evidence produced, however, I do not find sufficient proof of any "of the indicia of undue influence or other slight circumstances" to shift the burden of proof from *Page 149 
the appellants to the proponents. The testimony shows only a long-continued course of conduct of partiality by Madeleine Taitt Raynolds in favor of her own three sons as against those of the first Mrs. Raynolds, together with an attempt to prevent the testator from participating in the associations and activities of his two oldest sons. By that proof the burden resting upon the appellants is not shifted.
 UNDUE INFLUENCE.
There is no charge of undue influence exerted by the principal beneficiaries of this will. The influence charged as undue, and resulting in the discrimination between the sons by the first wife and those by the second, was that of the second wife who died more than three and one-half years before the last will and testament were executed.
All counsel in this controversy are agreed as to the law relating to undue influence as it is defined by the courts of this state. However, the divergence occurs in the application of the law to the facts as disclosed by the evidence.
In our state, it is said that undue influence "consists in the destruction of free agency, and whether this be accomplished by a strong or slight exercise of power, or by force or peaceful means, is wholly immaterial, for if it appears to have been sufficient to destroy free agency, and to have constrained the person, whose act is brought in judgment, to do what was against his will, and what he would not have done if he had been left free, it constitutes what the law calls undue influence."Bennett v. Bennett, 50 N.J. Eq. 439 (at p. 447).
It is true that such influence can never be precisely defined. Each case must necessarily depend upon so many and varied factors, such as physical condition, sex, age, temperament and the means of coercion or influence employed, as well as other circumstances, that it must be governed by its own peculiar circumstances. Turner v. Cheesman, 15 N.J. Eq. 243; Executorsof Moore v. Blauvelt, 15 N.J. Eq. 367; Lynch v. Clements,24 N.J. Eq. 431; Haydock v. Haydock, 33 N.J. Eq. 494; affirmed,34 N.J. Eq. 570; Rusling v. *Page 150 Rusling, 36 N.J. Eq. 603; Elkinton v. Brick, supra; Dumont v.Dumont, supra; Fritz v. Turner, supra; Clifton v. Clifton,47 N.J. Eq. 227; In re Tunison's Will, supra; In re Brengel'sWill, 85 N.J. Eq. 487; affirmed, 85 N.J. Eq. 599; Loveridge v.Brown, supra; In re Hops, 103 N.J. Eq. 11; affirmed,147 Atl. Rep. 910; Den ex dem. Trumbull v. Gibbons, 22 N.J. Law 117,136; 1 Jarm. Wills 36-9-40; 1 Wms. Ex. 40, 45; Kinderside v.Harrison, 2 Phil. 449 (1 Eng. Eccl. Rep. 336); Mynn v.Robinson, 2 Hag. 169; Small v. Small, 4 Greenl. 223; Davis v.Calvert, 5 Gill J. 302; Martin v. Teague, 2 Spear's R. 268.
The authorities are in practical agreement as to the definition of undue influence. The legal rule is plain, only its application is difficult. The remarks of the Ordinary in Elkinton v.Brick, supra (at pp. 165-166) are particularly illuminating:
"Undue influence must be such influence as destroys free agency and amounts to moral or physical coercion. Importunity which cannot be resisted, or which is yielded to for the sake of peace, amounts to coercion and the destruction of free agency (Trumbull v. Gibbons, 2 Zab. 117), but it can hardly be that the mere suggestion to a testator that an indicated testamentary provision would be productive of justice between the natural objects of his bounty, will destroy the freedom of his will. It has been held that even persuasion, which is beyond the bounds of mere suggestion, may be of such a character as not to amount to undue influence. Trumbull v. Gibbons, supra; Hughes v.Murtha, 5 Stew. Eq. 288. To attempt to persuade a testator, however, is treading upon dangerous ground, for the result may be that he will be led to assent to that which, of his own free will, he would not have assented to. It is impossible to distinguish by a fixed rule, between acts which are within the bounds of legitimate influence and acts which make the influence undue. Similar acts may be trifling and of no importance in the case of one person, and overmastering in the case of another. Their effect must depend upon the relations between the parties, and the character, strength and condition of each (Rusling v.Rusling, 9 Stew. Eq. 603; Dale v. Dale, 11 Stew. 274;Waddington v. Buzby, 16 Stew. 154), and must be *Page 151 
determined by the application of sound sense to the facts of each given case."
It is difficult to have evidence of overt acts such as one could point to and declare "there is an act of undue influence." Such acts are performed in camera. So well recognized is this truism that the courts have repeatedly declared that proof of undue influence need not be by direct evidence of appropriate acts of influence, but on the contrary may be shown by such circumstances as would convince the court that such evil practice had been pursued. There must, however, be something definite, certain and convincing in the testimony. Fritz v. Turner,supra; White v. Starr, 47 N.J. Eq. 244; Davis v. Babb, infra;Emery v. Emery, 222 Mass. 439; 111 N.E. Rep. 287; Johnson'sCase, 80 N.J. Eq. 525; In re McComb, 118 N.J. Eq. 119; Smith v.Smith, 48 N.J. Eq. 566; In re Everett's Will, infra.
In order that the influence alleged to be undue be held to vitiate a will it must be operative at the time the will is executed. Steadman v. Steadman, 14 Atl. Rep. 406; Dudderar v.Dudderar, 116 Md. 505; 82 Atl. Rep. 453, 456. The time at which the influence complained of is unduly exerted is of no moment so long as its effect remains operative at the time the will is executed. Thomas v. Cortland, 121 Md. 670; 89 Atl. Rep. 414;Davis v. Calvert (Md.), 5 Gill J. 269; Moore v.McDonald, 68 Md. 321; 12 Atl. Rep. 117; In re Craft's Estate,85 N.J. Eq. 125; In re Tobin, 111 N.J. Eq. 592 (reversed on question of allowance of fees, 114 N.J. Eq. 170); and see, also, Schuchhardt v. Schuchhardt, supra; Arnault v. Arnault,52 N.J. Eq. 801.
In Davis v. Babb, 190 Ind. 173; 125 N.E. Rep. 403, 406, the Supreme Court of Indiana said:
"It may happen that the fruit of an evil and improper influence is born long after the influence is exerted. Taylor v. Wilbur,20 Mo. 306; 64 Am. Dec. 186; Lisle v. Couchman, 146 Ky. 345;142 S.W. Rep. 1023."
"Undue influence need not be proven by direct and positive evidence but it may be inferred from or shown by the facts and circumstances in evidence; nor is it necessary that the overt acts of undue influence should have been exercised at *Page 152 
the exact time of the execution of the will and codicil, but it is sufficient to show that such influence over the mind of the testator had been acquired previously and did operate at the time the will and codicil were made. Mowry v. Norman, 204 Mo. 173,193; 103 S.W. Rep. 15."
Likewise, the court in In re Everett's Will (Vt.),166 Atl. Rep. 827, appropriately remarked (at p. 830):
In order to void a will on the ground of undue influence, the influence must be such as to destroy the free agency of the testator at the time and in the very act of making the instrument; but this does not mean that such influence must be directly exerted at the moment the instrument is executed, or within any particular time prior thereto, but rather that, whenever exerted, whether months or years before, it must still be operative upon the testator's mind in the very act of executing the instrument and be an effective cause of the disposition made therein. Seals v. Seals, 213 Ky. 779;281 S.W. Rep. 982; Thomas v. Cortland, 121 Md. 670;89 Atl. Rep. 414. * * *"
In the instant case contestants allege that the course of conditioning the testator's mind, pursued by their stepmother, began immediately after the birth of her first child, and continued throughout her life; that because of the continuous course of this conduct on the part of his wife, testator's mind and will were so controlled by her that her will, in fact, was substituted for his.
I believe there is no dispute that mere suggestion or even persuasion can never be classed as undue influence, so long as it does not destroy free agency, and amount to moral or physical coercion. The language employed by Ordinary McGill in McCoon v.Allen, 45 N.J. Eq. 708 (at p. 719), clearly recites the law on this question:
"Every influence is not undue. Suggestions, and even persuasion, may be safely used with a testator, if they do not destroy free agency and amount to moral or physical coercion.Elkinton v. Brick, 17 Stew. 154, 165. No rule can be laid down to define the limit of legitimate influence. Each case must depend upon, and be determined by the circumstances and conditions which surround it." *Page 153 
And while it is true that suggestions or persuasion do not amount to that influence which is frowned upon by the courts, an even greater latitude is allowed between a husband and wife by virtue of the sanctity of the marital relationship than is allowed between any other class of persons. This is recognized in this state, notably in the cases of In re Barnett, 2 N.J. Mis.R. 135, and Hughes v. Murtha, 32 N.J. Eq. 288, and the doctrine is recognized in other states in the representative case of In re Everett's Will, supra. In that case, the Vermont court says (at p. 836):
"Their relation is such that a greater latitude in the influence either may exert over the other without its becoming undue in the eyes of the law is recognized."
In this state, In re Barnett, supra (at p. 141), the pronouncement is:
"The latitude allowed a husband or wife to influence the spouse arises out of the marital relation itself. * * * A husband and wife has ordinarily a right to counsel and persuade his or her spouse in the best interest and welfare of the family, to appeal to his or her sense of justice and duty, to urge his or her views as to the proper, expedient, or wise disposition to be made of the spouse's property, and also to influence the spouse in his or her favor."
For the purpose of argument, it may be conceded that Madeleine Taitt Raynolds brought all her powers of persuasion to bear upon her husband to induce him to prefer her own sons over her stepsons in the testamentary disposition of his estate. And it may be that the testamentary disposition here complained of resulted largely from her entreaties and persuasions. But it does not follow that the influence thus exerted by her was undue. It was not undue unless his will was overcome by hers; unless her will was substituted for his; unless it appears that, without such substitution, a different disposition of his estate would have been made by the testator; in short, unless it appears that the questioned document is her will, not his. He may have submitted to persuasion and succumbed to entreaty, but if he was still free to do otherwise, and if what he did was in the exercise of his free will, even though induced by persuasion and entreaty, *Page 154 
it cannot be said to be the result of undue influence. Her arguments may have appealed to his "sense of justice and duty," and his yielding, if he did yield, may as well have been the result of love for his wife as of fear or coercion. Dumont v.Dumont, supra. His two first born had already received substantial inheritances from their mother and maternal grandmother. The father may have thought that the disposition of his estate made by his will would equalize the benefits of inheritance amongst his five children. In fact, as will hereinafter appear, that reason is implicit in the language of the 1922, 1926 and 1931 wills, as the testator therein referred to the fact that Edward and Harold were beneficiaries under the wills of their mother and grandmother. That his two first born had lost their competence need not have been a controlling circumstance in the eyes of the father. They had at least had their inheritance, while that of the others was only in prospect. And in this connection it must be borne in mind that Mrs. Raynolds was testator's wife, and the mother of three of his sons, and that these three were sons of the testator no less than the appellants. Nor does it appear by any of the proofs that without the interference of Mrs. Raynolds, without her entreaty or persuasion, all of which rests in mere inference and conjecture, the disposition of testator's estate would have been different from that provided in his challenged will. InSchuchhardt v. Schuchhardt, supra, it was held that:
"When undue influence is claimed to be established by inference from certain facts proved, and, upon all the facts proved, an equally justifiable inference may be drawn that the will executed was what the testator would have made under the circumstances, the burden on contestants is not supported."
 SURVIVAL OF INFLUENCE AFTER DEATH OF DOMINANT PERSON.
Applicants have introduced evidence of the treatment of them by their stepmother and statements made to them by their father to the effect that he could not do as he desired *Page 155 
with the boys "because your stepmother objects." By this evidence they attempt to show a coercion or importunity extending from the date of the birth of the eldest son of Madeleine Taitt Raynolds down to the date of her death, such influence continuing thereafter until the death of the testator. That such evidence is admissible even though remote, see In re McComb, 118 N.J. Eq.
(at p. 120); In re Everett's Will, supra; Steadman v.Steadman, supra; In re Dolan, 108 N.J. Eq. 183. The probative value of such evidence, however, is for the court to determine. On this phase of the case appellants rely strongly upon In reEverett's Will, supra. That case came before the appellate court principally on the question of the admissibility of evidence, and although the lower court disallowed the original will, the decision was reversed and the cause remanded to the lower court by the Supreme Court of Vermont for a new trial. There Edward H. Everett married one Grace Burnap on March 27th, 1920. He was then sixty-nine years of age, thirty years older than Miss Burnap. He died April 28th, 1929. It was claimed by the contestants that the decedent's condition of mind at the time of the execution of the instrument was such that it was completely overpowered by the will of his wife; that this condition on her part began soon after she became acquainted with decedent and continued to the time of the execution of the will. After reciting some of the evidence, the court (at p. 838), said:
"Without further reference to the evidence, or what it tended to show, we are satisfied that, taken as a whole, the evidence clearly made a case for the jury on the issue of undue influence."
That was merely a declaration of the admissibility of the evidence, not as to its sufficiency.
It is argued that the personality and strength of character of Mrs. Raynolds was so great, and her influence over her husband so profound, that her influence continued from her death until that of her husband over six years later. There is little doubt that it is possible for the influence of one departed to be felt long after his decease; but there is no direct evidence of any act, conduct or language employed by *Page 156 
decedent's wife which show undue influence surviving after her death. Proof of such survival, as already suggested, is only by inference and conjecture. Cases in point are Middleditch v.Williams, 45 N.J. Eq. 726 (reversed, 47 N.J. Eq. 585, on question of procedure); Smith v. Smith, supra, and In rePowell, 138 Ia. 326; 11 N.W. Rep. 821; 26 L.R.A. (N.S.)479). In Middleditch v. Williams, supra, the testator executed a will on January 11th, 1887, and died February 4th, 1888. His wife died in August, 1886. Mr. Livingstone, the testator, was a spiritualist, and believed that he had spirit messages from his wife instructing him as to the testamentary disposition of his property, which instructions the testator followed. The court held in this case that the will was not the product of undue influence, but the fact that a post mortem
influence could have been exerted was not questioned.
In In re Powell, supra, Mrs. Powell died June 20th, 1905. Her husband, Benjamin, died March 21st, 1901. Her will was executed May 22d 1905, and was made in accordance with her husband's wishes and, the court found, in accordance with her will as well. However, the fact that such post mortem influence might have remained so as to affect the disposition of property was not questioned.
Appellants also rely strongly upon the decision, or rather the opinion, of Chancellor McGill sitting as Ordinary in the New Jersey Prerogative Court in Smith v. Smith, supra. In that case the undue influence complained of was claimed to have been exerted by one Agnes Gilkerson, the testator's paramour, who died more than five years before the execution of the will there attacked. The testator died on November 3d 1887, one year and three months after the execution of his purported will. The will provided, in substance, that the remainder of his estate should go to a board of trustees to establish a school for apprentices and young mechanics. It was urged that this will was the product of undue influence and that the will was executed by him while under a delusion. Although much of that opinion dealt with the question of delusion and lack of testamentary capacity, the court likewise deals at some length with the question of undue influence. The court found from the facts that the will was not the *Page 157 
product of any delusion of the testator, nor was it the product of any undue influence exerted by his paramour. The possibility
of the paramour's influence surviving her death seems to have been assumed by the court.
In disposing of the question of the survival of such influence, Chancellor McGill (at p. 589), said:
"The paper here disputed was made more than five years after the death of Agnes Gilkerson. That it was in accordance with her wish can hardly be denied. * * * But did that wish or request amount to moral or physical coercion? If it had never been expressed or made, would he have made such a will? * * * It is difficult to believe that her influence so dominated that, but for it, he would not have made the will in question. That her wish was remembered and respected cannot be doubted. * * *
"In proof of undue influence, we have literally no evidence except the declarations of Smith above indicated, and they merely open the door to conjecture. The great lapse of time between the death of Agnes and the execution of this will makes strongly against everything suggestive of inference or presumption, and in favor of my conviction that the disputed paper was the product of Smith's own will."
The pertinency of that language to the instant case is too obvious for comment. It is interesting to note, however, that while the Smith will was held valid, the trust therein created was later held invalid by Chancellor McGill in Smith v. Smith,54 N.J. Eq. 1, and that decision was affirmed by the Court of Errors and Appeals in 55 N.J. Eq. 821.
 DECLARATIONS OF THE TESTATOR.
So, too, the contestants, because of the difficulty of proofs, rely on the declarations of the testator made to Harold and Edward and to Mr. Groebe as proof of circumstances and conduct amounting to undue influence on the part of Mrs. Raynolds. Such evidence cannot be admitted to prove the facts as claimed, but may be used solely for the purpose of showing the state of mind of the testator at the time the statements were made. Rusling
v. Rusling, 36 N.J. Eq. *Page 158 603; In re Anastasia Davis, 73 N.J. Eq. 617; In re Sullivan,126 N.J. Eq. 182; The Rusling Will Case, 4 N.J.L.J. 218.
 INJUSTICE RESULTING FROM THE WILL.
The appellants declare that the will is "not alone unjust but harsh and cruel," and while not asserting "that a will that ismerely unjust may not stand," they argue that in view of "other circumstances here present, the injustice of the will becomes one of the elements contributing to its undoing." With this contention I cannot agree. It is, of course, well settled that mere injustice in a will does not invalidate it. In Smith v.Smith, supra (at p. 691), Chancellor McGill said:
"His power of disposition is absolute. Possessing capacity he may give to whom he pleases. This power is a weapon to the weak and the old, who, without it, might be despised and neglected.The courts cannot reject a will because it does not comport withtheir ideas of propriety and justice, or even because it appearsto be unreasonable, unjust, injudicious or cruel. If a testator observes the requirements of the law, and possesses capacity, he may lawfully make an unjust will." (Italics mine.)
See, also, Turner v. Cheesman, supra; Brick v. Brick,44 N.J. Eq. 282; Middleditch v. Williams, supra; Bennett v.Bennett, 50 N.J. Eq. 439; In re Eatley's Will, supra; In reYoung, 90 N.J. Eq. 236; In re Haness' Estate, 98 N.J. Eq. 645; Inre Triebe, 114 N.J. Eq. 227; In re Halton, supra; In re Barber'sWill, 49 Atl. Rep. 826.
It may be conceded that injustice coupled with other circumstances might well, in a proper case, turn the scales of justice against the validity of a will, but the "circumstances here present" while they may "contribute" toward, do not effect
the present will's "undoing."
 DEATH-BED PROMISE.
In addition thereto, stress is laid on the evidence produced to show that Mr. Raynolds had made a death-bed *Page 159 
promise to his wife not to change the basic parts of his will. InExecutors of Moore v. Blauvelt, supra, the testatrix had made a will in accordance with such a promise but was later induced by her children to change it, and the changes thus made violated that promise. The court held that these changes were the result of undue influence and refused probate of the later will. In the instant case, to prove the alleged death-bed promise, testimony was introduced to show that testator told Harold and Teddy that he couldn't advance to Reggie his inheritance because he had made what was practically a death-bed promise that his will would not be changed after her death. He (testator) said, "Teddy, you know she led me a dog's life, but after all, she was my wife and I will always respect that promise." He told Teddy a year later the promise applied to Arthur as well as Reggie. Likewise there was introduced the testimony of a Mr. Groebe who was in business with Reggie and who testified that during a conversation with Raynolds, senior, he was told that although Raynolds changed his will frequently, the basic parts of his will would never be changed because of a promise and agreement he had made with his wife.
Such a promise does not per se indicate the substitution of the will of the promisee for that of the promisor, and unless there are elements to show that such promise was extracted from the testator by the dying spouse through undue influence, so as to substitute one's free will for that of another, a testament made in accordance with such promise will not be set aside.
 RATIFICATION.
It is also true that a will may be ratified, even though originally obtained by undue influence, and by that ratification the bane of such influence removed. Ratification may result if a testator allows such a will to remain uncanceled for any considerable length of time after its execution and after the removal of the influence which produced it, or from republication thereafter. Will of Seaman, 6 N.J.L.J. 201; Taylor v. Kelly,31 Ala. 59; Shayler v. Bumstead, *Page 160 99 Mass. 112; Small v. Small, 4 Me. 220 (where the will remained uncanceled for four years); Wilson v. Moran, 3 Bradf.172 (where it remained so for six years); Pearce v. Pearce,38 Mich. 412 (where it was kept by testator for nearly two years after its execution at the time of which execution he was alleged to have been intoxicated). From the provisions of the various wills and codicils of Edward Hidden Raynolds we note a remarkable consistency in the disposition of his estate. The will executed on May 8th, 1933, which was after the death of his wife on April 25th, 1933, and all subsequent wills including the will of June 30th, 1936, and the two codicils thereto, the last of which was February 21st, 1939, which codicils were republications of the wills to which they were codicils, tend to show ratification under the cases above cited.
An examination of the wills and codicils made by the testator from 1922 to 1939 is facilitated by the use of a chart. From an examination of the provisions of these various wills and their codicils it will be seen that there is a substantial similarity in all of them. Details of trusts, appointments of executors need not be set forth. Each will, until her death, provided for the occupancy of the home by Madeleine Taitt Raynolds.
The chart is as follows: *Page 161 
 WILLS AND CODICILS OF EDWARD HIDDEN RAYNOLDS.
==========================================================================
 FAMILY Will of Dec. Will of March
 LEGATEES 13, 1922 10, 1926
--------------------------------------------------------------------------
Wife $10,000, furniture, $10,000, furniture,
 c., and 1/3 of jewelry, clothing,
 residue for life M.T.H. trust of
 1/3 of residue
All 5 sons Wearing apparel, Jewelry formerly
 jewelry equally, of mother
 interest in Est.
 T.H. Hidden
 equally
Edward F. $25,000 $50,000
Harold $25,000 $50,000
Arthur 2/9th of residue in A.H.R. trust, 2/9ths
 trust of residue — Library,
 etchings, c., by 3d
 codicil dated 1/6/30
Reginald 2/9th of residue in R.M.R. trust, 2/9ths
 trust of residue
Lawrence 2/9th of residue in L.I.R. trust, 2/9ths
 trust of residue
Grandsons (Harold's ........ ........
two sons)
Laura T. Taylor $20,000 in trust; by Same
 1st codicil 4/20/25
 priv. of burial in
 family plot
--------------------------------------------------------------------------
 OTHER THAN
 FAMILY
Lucy Cleveland ........ ........
Woodlawn Cemetery $2,000 for care of ........
 plot
Metropolitan Museum Oil painting of Same
 mother
Joseph Flore ........ $5,000 by 2d codicil
 2/4/29
 $2,000 by 4th codicil
 12/15/30
 1st codicil to above
 will 4/19/26 relates
 to investments
 2d and 4th codicils
 2/4/29 and 12/15/30
 deal with period of
 wife's occupancy of
 home
==========================================================================
 FAMILY Will of Dec. Will of Aug. Will of May
 LEGATEES 14, 1931 2, 1932 8, 1933
--------------------------------------------------------------------------
Wife Same as 1926 $2,000, Died April 25,
 otherwise same 1933
 as 1926
All 5 sons Same as 1926 Same as 1926 Wearing apparel,
 Jewelry, c.
Edward F. $25,000 ........ $10,000
Harold $25,000 ........ $10,000
Arthur Same as 1926 Same as 1926 1/3 of residue in
 trust
Reginald Same as 1926 Same as 1926 1/3 of residue in
 trust
Lawrence Same as 1926 Same as 1926 1/3 of residue in
 trust
Grandsons (Harold's ........ ......... .........
two sons)
Laura T. Taylor $10,000 in ........ $20,000 and right
 trust of burial
 Codicil dated
 1/26/34
 $10,000 in trust for
 life
--------------------------------------------------------------------------
 OTHER THAN
 FAMILY
Lucy Cleveland ........ ........ Codicil dated
 1/26/34
 $10,000 in trust for
 life
Woodlawn Cemetery ........ ........ ........
Metropolitan Museum Same Same Same
Joseph Flore $2,000 $2,000 $2,000
==========================================================================
 FAMILY Will of April Will of June
 LEGATEES 14, 1936 30, 1936
--------------------------------------------------------------------------
Wife ........ ........
All 5 sons Same as 1933 Same as 1936
Edward F. $10,000 $10,000
Harold $10,000 $10,000
Arthur Same as 1933 Same as 1933
Reginald Same as 1933 Same as 1933
Lawrence Same as 1933 Same as 1933
Grandsons (Harold's By codicil dated $5,000 each
two sons) 5/21/36, Harold, By 1st codicil
 Jr., and Stuart, 3/2/37 $10,000
 $5,000 each each
Laura T. Taylor $2,000 and right $2,000 and privilege
 of burial of burial in
 family plot
--------------------------------------------------------------------------
 OTHER THAN
 FAMILY
Lucy Cleveland $2,000 $2,000
Woodlawn Cemetery ........ ........
Metropolitan Museum Same Same
Joseph Flore $2,000 $2,000
 2d codicil 2/21/39
 changes one executor

NOTE: Details of administration, duties of trustees and allied matters are not listed. *Page 162 
In the 1922 will testator explained the difference in the provisions for his two eldest sons and those for his sons by his second wife by the statement — "because of the fact that they have heretofore been beneficiaries to a large extent under the wills of their mother and grandmother and because of my desire to provide for the comfort and welfare of all my children to the extent which I deem necessary and proper in view of the situation in which each of my said children is at this time." In the 1926, 1931 and 1932 wills he explains the provisions for his two eldest sons, or the lack thereof, by the statement that, "I am mindful of the fact that my said sons, Edward F. and Harold, were beneficiaries under the wills of their mother and grandmother."
By the will of 1933 testator left a $10,000 cash bequest to each of the two older sons, but failed to mention any reason for so doing. The same applies to both of the 1936 wills. But, as his power of disposition of his estate was absolute (Smith v.Smith, supra), no explanation of what he did was necessary, and he may have been so advised by his lawyer. From the statements of his reasons as contained in the prior wills, however, it may reasonably be inferred that the same reasons prompted the provisions for the two eldest sons, or the lack thereof, as contained in the later wills.
To conclude that the last will of Edward Hidden Raynolds was the product of undue influence by the second wife, continuing to the date of execution, notwithstanding her death several years before, we must first find that prior wills offered in evidence, and from the provisions of which there was but little deviation in the last will, were also the product of undue influence. If they were not, certainly the last will cannot be. The evidence is far from convincing that the prior wills were the result of any undue influence. As I see it, the evidence shows nothing more than those suggestions and that persuasion which may safely be used or employed by any wife or mother so long as they do not destroy the free agency of the testator and amount to moral or physical coercion. McCoon v. Allen, supra; In re Powell,supra; Clifton v. Clifton, 47 N.J. Eq. 227; In re Eatley's *Page 163 Will, supra; In re Tobin, supra; Dudderar v. Dudderar, supra.
The principles expressed in White v. Starr, supra, apply to the instant case:
"As the case stands, there is no direct evidence of either undue influence or fraud, and the circumstances relied upon in proof of it are, with perhaps a single exception, explainable and explained upon the hypothesis that the will was the free act of a competent testator. All that is left rests in suspicion and conjecture, which is not sufficient to satisfy the judgment that the will is the product of fraud or coercion."
I will advise a decree affirming the order below admitting the will to probate. *Page 164